UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QSGI, INC., | ) | Case No. 09-23658-BKC-EPK |
| QSGI-CCSI, INC., | ) | Case No. 09-23659-BKC-EPK |
| QUALTECH SERVICES GROUP, INC., | ) | Case No. 09-23660-BKC-EPK |
| | ) | |
| Debtors. | ) | |
| | ) | |

**DEBTORS, QSGI, INC., QSGI-CCSI, INC., QUALTECH SERVICES
GROUP, INC.'S PROPOSED DISCLOSURE STATEMENT
IN SUPPORT OF DEBTORS' PLAN OF REORGANIZATION**


**DATED OCTOBER 8, 2010**


Respectfully submitted,


*s/ Michael A. Kaufman*
**MICHAEL A. KAUFMAN, ESQ.**
**Florida Bar No.: 0628042**
MICHAEL A. KAUFMAN, P.A.
1655 Palm Beach Lakes Boulevard, Suite 1012
West Palm Beach, Florida 33401
Telephone: (561) 478-2878
Facsimile: (561) 584-5555
Email: michael@mkaufmanpa.com
Counsel for the Debtors

**DISCLOSURE STATEMENT**

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE DEBTORS' PLAN OF REORGANIZATION UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE DATED AS OF OCTOBER 6, 2010 (AS AMENDED FROM TIME TO TIME, THE "PLAN"), AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED LEGAL ADVICE ON THE TAX LAWS OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.  ANY CREDITOR OR OTHER PARTY BUYING OR SELLING A CLAIM BASED ON THE INFORMATION CONTAINED HEREIN DOES SO AT ITS OWN RISK.

ALL CREDITORS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND EXHIBITS CAREFULLY AND COMPLETELY BEFORE DECIDING TO ACCEPT OR REJECT THE PLAN.  IF A DISCREPENCY BETWEEN THE DISLCOSURE STATEMENT AND THE TERMS OF THE PLAN, THEN THE PLAN SHALL GOVERN.

THE MANAGEMENT AND OUTSIDE BOARD OF DIRECTORS OF THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF THE CREDITORS.  IN THE OPINION OF THE DEBTORS, THE TREATMENT OF CLAIMS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS.  ACCORDINGLY, THE DEBTORS BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND RECOMMENDS THAT CREDITORS VOTE TO ACCEPT THE PLAN.

THE PLAN PROPOSES EXCULPATION FROM LIABILITY AS TO THE DEBTOR FOR CERTAIN PREPETITION AND POSTPETITION ACTIONS IN CONNECTION WITH THE BANKRUPTCY CASE, WHICH PROVISIONS WOULD ENJOIN THE DEBTOR, HOLDERS OF CLAIMS, HOLDERS OF INTERESTS AND ANY LIQUIDATING AGENT FROM PURSUING CERTAIN ACTIONS AGAINST SUCH PARTIES EXCEPT AS OTHERWISE PROVIDED IN THE PLAN.  ALL CREDITORS, HOLDERS OF INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO READ CAREFULLY ARTICLE 11.3 OF THE PLAN ON EXCULPATION FROM LIABILITY.

THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION COMMENTED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT.  THE DISCLOSURE SATEMENT AND THE PLAN HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS.

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED

IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATACHED HERETO OR THE ACCOMPANYING DOCUMENTS INCORPORATED BY REFERENCE OR REFERRED TO HEREIN.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE FINANCIAL PROJECTIONS DESCRIBED IN THE DISCLOSURE STATEMENT HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT TOGETHER WITH THEIR ADVISORS.  THE FINANCIAL PROJECTIONS ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES MANY OF WHICH ARE BEYOND THE DEBTORS CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATION OR WARRANTY CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS.

IN THE EVENT THAT ANY IMPAIRED CLASS OF CLAIMS OR INTERESTS VOTES TO REJECT THE PLAN (1) THE DEBTOR MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN WITH RESPECT TO THAT CLASS UNDER THE BANKRUPTCY CODE'S "CRAMDOWN" PROVISIONS AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO SUCH REQUIREMENTS, OR (2) THE PLAN MAY BE OTHERWISE MODIFIED OR WITHDRAWN.

THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS TO ACCEPT THE PLAN AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH IN THE SECTION OF THIS DISCLOSURE STATEMENT TITLED "VOTING ON AND CONFIRMATION OF THE PLAN."

PLEASE REFER TO THE RISK FACTORS OUTLINED ON PAGE 7OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR VOTING ON THE PLAN SHOULD CONSIDER.

# DISCLOSURE STATEMENT PURSUANT TO
# SECTION 1125 OF THE BANKRUPTCY CODE

## INTRODUCTION

QSGI, INC. (Case No.: 09-23658), QSGI-CCSI, INC. (Case No.: 09-23659), and QUALTECH SERVICES GROUP, INC. (Case No.: 09-23660 (collectively the "Debtors" and/or "Debtor")[1] have filed with the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "Bankruptcy Court"), their Plan of Reorganization under Chapter 11 of Title 11, United States Code dated as of October 8, 2010 (as amended from time to time, the "Plan"). This Disclosure Statement for Debtors' Plan of Reorganization under Chapter 11 of Title 11, United States Code dated as of October 8, 2010 (the "Disclosure Statement"), is submitted pursuant to Section 1125 of the Bankruptcy Code, 11 U.S.C. Section 101, et. Seq. (the "Bankruptcy Code"), in connection with the solicitation of votes on the Plan from Holders of Impaired Claims against, and Impaired Interests in the Debtor and the hearing on Confirmation of the Plan scheduled for _____, 2010, at _____ a.m.

This Disclosure Statement has not yet been approved by the Bankruptcy Court in accordance with Section 1125(b) of the Bankruptcy Code as containing information of a kind and in sufficient detail adequate to enable a hypothetical reasonable investor typical of Holders of Claims in the relevant Voting Classes (as defined below) to make an informed judgment whether to accept or reject the Plan. A hearing will be set by the Bankruptcy Court.

The Plan has been approved by the outside Board of Directors and management of the Debtors. In the opinion of the Debtors, as described below, the treatment of claims under the plan contemplates a greater recovery than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtors. Accordingly, the Debtors outside Board of Directors believe that confirmation of the Plan is in the best interests of creditors and recommend that creditors vote to accept the Plan.

Accompanying this Disclosure Statement are copies of the following:

(a) The Debtors' Plan of Reorganization (the "Plan") attached hereto as Exhibit A;
(b) In the case of Impaired Classes of Claims (collectively, the "Voting Classes"), a Ballot for acceptance or rejection of the Plan attached hereto as Exhibit B; and
(c) Financial Projections and Liquidation Analysis attached hereto as Exhibit C.

## PURPOSE OF THIS DISCLOSURE STATEMENT

The Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") on July 2, 2009 (the "Petition Date"). The Plan of Reorganization is being simultaneously filed with the Disclosure Statement. The Debtors may file amendments to the Plan from time to time. The following introduction and summary is a general

---

[1] Since the filing of their petitions for relief under Chapter 11, the Debtors made application to and were approved by the Court to be jointly administered under the lead case of QSGI, Inc., having Case No.: 09-23658.

overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements appearing elsewhere in this Disclosure Statement and the Plan. All capitalized terms not defined in this Disclosure Statement have the meanings given to them in the Plan. A copy of the Plan has been separately filed in the lead Chapter 11 Case.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek Chapter 11 protection, significant events that have occurred during the Chapter 11 Case, and the anticipated reorganization of the Debtors. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and how voting on the Plan will occur. Certain provisions of the Plan, and thus the descriptions and summaries contained in this Disclosure Statement may be: (a) the subject of continuing negotiations among the Debtors and various parties; (b) may not have been finally agreed on; and/or (c) may be modified. Those modifications, however, will not have a material effect on the distributions contemplated by the Plan.

The Debtors are the proponents of the Plan within the meaning of Bankruptcy Code §1129. The Plan contains separate Classes and proposes recoveries for Holders of Claims against and Equity Interests in the Debtors. After careful review of the Debtors' current business operations, estimated recoveries in a liquidation scenario, and the prospects of ongoing business, the Debtors have concluded that the recovery to Creditors will be maximized by the reorganization of the Debtors as contemplated by the Plan. The reorganized Debtors will be the disbursing agent under the plan to the unsecured creditors. American Stock Transfer & Trust Company will be the disbursing agent for the stock to Lawful Holders of the Reorganized Debtor, QSGI, Inc. pursuant to the Plan.

Specifically, the Debtors believe that continued operations after confirmation of the Plan provides Creditors and Holders of Equity Interests with the maximum possible recovery under the circumstances.

**VOTING INSTRUCTIONS**

**Who May Vote**

Only the Holders of Claims and Equity Interests which are deemed "Allowed" under the Bankruptcy Code and which are "Impaired" under the terms and provisions of the Plan are permitted to vote to accept or reject the Plan. For purposes of the Plan, only the Holders of Allowed Claims and Allowed Equity Interests in the Voting Classes are Impaired under the Plan and thus may vote to accept or reject the Plan. A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO MEMBERS OF THE VOTING CLASSES. **A BALLOT WILL BE PROVIDED UPON APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.**

**Notice to Holders of Claims and Equity Interests**

This Disclosure Statement is being used to solicit votes on the Plan only from Holders of Impaired Claims, and is being transmitted to Creditors with Unimpaired Claims and to Holders of Equity Interests and other parties in interest for informational purposes. The Bankruptcy Court has not yet approved this Disclosure Statement.  The fact that the Bankruptcy Court has not yet approved this Disclosure Statement does not constitute a deficiency in the accuracy or completeness of the information contained in this Disclosure Statement.

This Disclosure Statement and the other materials included in the solicitation package are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes on the Plan. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors or the Plan other than the information contained in this Disclosure Statement.

Certain of the information contained in this Disclosure Statement is by its nature forward-looking and contains estimates, assumptions and projections that may be materially different from actual or future results. Except as otherwise specifically stated, this Disclosure Statement does not reflect any events that may occur after the date of this Disclosure Statement and that may have a material impact on the information contained in this Disclosure Statement. The Debtors and/or the Reorganized Debtors reserve the right to amend and/or supplement this Disclosure Statement as needed from time to time.

Except where specifically noted, the financial information contained in this Disclosure Statement has not been audited by a certified public accountant and may not have been prepared in accordance with generally accepted accounting principles.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances of the Plan and may not be relied on for any purpose other than to determine how to vote on the Plan. No person may give any information or make any representations, other than the information and representations contained in this Disclosure Statement, regarding the Plan.

This Disclosure Statement has been prepared in accordance and compliance with Bankruptcy Code §1125 and Bankruptcy Rule 3016(b) and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law. This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "SEC") or any state securities commission, nor has the SEC passed on the accuracy or adequacy of the statements contained in this Disclosure Statement.

This Disclosure Statement may not be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan on holders of Claims against, or Equity Interests in, the Debtor.

**How to Vote**

Each Holder of a Claim or Equity Interest in a Voting Class should read the Disclosure Statement, together with the Plan and any exhibits hereto, in their entirety.  After carefully reviewing the Plan and this Disclosure Statement and its exhibits, please complete the enclosed Ballot, including your vote with respect to the Plan, and return it as provided below.  If you have an Impaired Claim in more than one Class, you should receive a separate Ballot for each such Claim.

If you receive more than one Ballot you should assume that each ballot is for a separate Impaired Claim and you should complete and return all of them.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures please call Michael A. Kaufman, Esq. at (561) 478-2878.

YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND RETURN IT TO THE ADDRESS FOR THE BANKRUPTCY COURT PROVIDED BELOW.  IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND RECEIVED BY THE CLERK OF THE BANKRUPTCY COURT BY NO LATER THAN SEVEN (7) DAYS BEFORE THE DATE OF THE CONFIRMATION HEARING.

All Ballots should be returned either by regular mail, hand delivery or overnight delivery to:

Office of the Clerk
United States Bankruptcy Court for the Southern District of Florida
1515 N. Flagler Drive
West Palm Beach, Florida 33401

With a copy to:

Michael A. Kaufman, Esq.
Michael A. Kaufman P.A.
1655 Palm Beach Lakes Boulevard, Suite 1012
West Palm Beach, Florida 33401

**Confirmation Hearing and Objections to Confirmation**

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for _____, 2010 at _____ .m. (the "Confirmation Hearing"), at the United States Bankruptcy Court, 1515 N. Flagler Drive, West Palm Beach, Florida 33401, which may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.

**Acceptance of Plan and Vote Required for Class Acceptance**

As the Holder of an Allowed Claim or an Allowed Equity Interest in the Voting Classes, your vote on the Plan is extremely important.  In order for the Plan to be accepted and thereafter confirmed by the Bankruptcy Court without resorting to the "cram-down" provisions of the Bankruptcy Code as to other Classes of Allowed Claims and Allowed Equity Interests, votes representing at least two-thirds in amount of Allowed Equity Interests of each Impaired Class of Equity Interests that are voted, must be cast for the acceptance of the Plan.  The Debtors are soliciting acceptances only from Holders of Claims in Classes 2, 3, 4, 5 and 6 which are the only Classes entitled to vote on the Plan.  You may be contacted by the Debtors or its agents with regard to your vote on the Plan.

To meet the requirement for confirmation of the Plan under the "cram-down" provisions of the Bankruptcy Code with respect to any Impaired Class of Claims or Equity Interests which votes to reject, or is deemed to vote to reject, the Plan (a "Rejecting Class"), the Debtor would have to show that all Classes junior to the Class rejecting the Plan will not receive or retain any property under the plan unless all Holders of Claims or Equity Interests in the Rejecting Class receive or retain under the Plan property having a value equal to the full amount of their Allowed Claims or Allowed Equity Interests.  For a more complete description of the implementation of the "cram-down" provisions of the Bankruptcy Code pursuant to the Plan, see "VOTING ON AND CONFIRMATION OF THE PLAN – Confirmation Without Acceptance by All Impaired Classes."

## RISK FACTORS

### FORWARD-LOOKING STATEMENTS AND ASSOCIATED RISK

Certain statements in the proposed Plan  constitute "forward-looking statements".  All such forward-looking information involves risks and uncertainties and may be affected by many factors, some of which are beyond our control.  These factors include:

- Our growth strategies.
- Anticipated trends in our business and demographics.
- Regulatory, competitive or other economic influences.

Forward-looking statements involve known and unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.   The words "believe", "expect", "anticipate", "intend" and "plan" and similar expressions identify forward-looking statements.  Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date the statement was made.

### Factors Affecting Future Operating Result

You should carefully consider the following risk factors, together with all other information contained or incorporated by reference in this Plan before you decide to approve it.  These factors could cause our future results to differ materially from those expressed in or implied by forward-looking statements made by us.  Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also harm our business.

### Uncertainty Of Future Financial Results

Our future financial results are uncertain.   There can be no assurance that we will be profitable, and we may incur losses in the foreseeable future.   Achieving and sustaining profitability depends upon many factors, including our ability to raise capital when needed, the success of our various marketing programs, and the maintenance or reduction of expense levels.

Fluctuations In Future Quarterly Results

Our quarterly operating results may fluctuate based on how well we manage our business. Some of the factors that may affect how well we manage our business include the timing of our delivery of significant orders; our ability to engineer customer solutions in a timely, cost effective manner; our ability to structure our organization to enable achievement of our operating objectives; our ability to meet the needs of our customers and markets; the ability to deliver, in a timely fashion, products for which we have received orders; the length of the sales cycle; the demand for products and services we offer; the introduction or announcements by computer manufacturers relating to the remarketing of new and used equipment; the hiring and training of additional personnel; as well as general business conditions. If we fail to effectively manage our business, this could adversely affect our results of operations.

Industry cycles may strain our management and resources

Cycles of growth and contraction in our industry may strain our management and resources. To manage these industry cycles effectively, we must: improve operational and financial systems; train and manage our employee base; successfully integrate operations and employees of businesses we acquire or have acquired; attract, develop, motivate and retain qualified personnel with relevant experience; and adjust spending levels according to prevailing market conditions. If we cannot manage industry cycles effectively, our business could be seriously harmed.

We Have Limited Principal Markets And Customers; We Have Significant Dependence On Major Customers; There Is A Risk Of Industry Concentration
We operate solely in the United States.

As a result of this concentration of our customers, our results of operations could be negatively affected if any of the following occurs: one or more of our customers becomes insolvent or goes out of business; one or more of our key customers significantly reduces, delays or cancels orders; or one or more of our significant customers selects products or services from one of our competitors.

Although we are striving to broaden our market focus to include sales to other markets, both nationally and internationally, in the immediate future we expect that we will continue to derive a substantial percentage of our sales of product in the United States. Accordingly, unfavorable economic conditions or factors that relate to these industries, particularly any such conditions that might result in reductions in capital expenditures could have a material adverse effect on our results of operations.

If We Need Additional Financing For Unanticipated Working Capital Needs Or To Finance Acquisitions, We May Not Be Able To Obtain Such Capital, Which Could Adversely Affect Our Ability To Achieve Our Business Objectives.

Our growth depends upon market growth and our ability to enhance our existing products and services, and to introduce new products and services on a timely basis. One of the ways to

accomplish this is through acquisitions.  Acquisitions involve numerous risks, including, but not limited to, the following:

- •  difficulty and increased costs in assimilating employees, including our possible inability to keep and retain key employees of the acquired business;
- •  disruption of our ongoing business;
- •  discovery of undisclosed liabilities of the acquired companies and legal disputes with founders or shareholders of acquired companies;
- •  inability to successfully incorporate acquired technology and operations into our business and maintain uniform standards, controls, policies, and procedures;
- •  inability to commercialize acquired technology;
- •  the need to take impairment charges or write-downs with respect to acquired assets and
- •  the failure of the acquired entity to perform as anticipated.

No assurance can be given that our prior acquisitions or our future acquisitions, if any, will be successful or provide the anticipated benefits, or that they will not adversely affect our business, operating results or financial condition.

<u>The Industry In Which We Compete In Is Highly Competitive</u>

We face competition in each area of our business.  Some of our competitors have greater resources and a more established market position than we have.  Some competitors have longer operating histories, larger customer or user bases, greater brand name recognition and significantly greater financial, marketing and other resources than we do.  Some of these competitors already have an established brand name and can devote substantially more resources to increasing brand name recognition and product acquisition than we can.

<u>No Dividends On Common Stock; Issuance Of Preferred Stock</u>

There can be no assurance that dividends will be paid in the foreseeable future.  We intend to use any earnings, which may be generated to finance the growth of our businesses.  Our Board of Directors has the right to authorize the issuance of preferred stock, without further shareholder approval, the holders of which may have preferences over the holders of the Common Stock as to payment of dividends.

<u>Dependence On Key Individuals</u>

Our success depends to a significant extent upon the continued contributions of our key management, technical and sales personnel, many of who would be difficult to replace.  The loss of one or more of these employees could harm our business.   Our success also depends on our ability to identify, attract and retain qualified technical, sales, marketing, finance and managerial personnel.  Competition for qualified personnel is particularly intense in our industry and in our locations.  This makes it difficult to retain our key personnel and to recruit highly qualified personnel.  We have experienced, and may continue to experience, difficulty in hiring and retaining candidates with appropriate qualifications.  To be successful, we need to hire candidates with appropriate qualifications and retain our key executives and employees.

We are organized with a small senior management team.  If we were to lose the services of one of the following members of our management team, our overall operations could be adversely affected.  We consider our key individuals as of the date of this Plan to be:

Marc Sherman CEO and David Meynarez CFO

## HISTORY AND BUSINESS OF THE
## DEBTORS PRIOR TO THE CHAPTER 11 FILING;
## EVENTS LEADING TO THE CHAPTER 11 FILING

The Debtors are QSGI, Inc., QSGI-CCSI, Inc. and Qualtech Services Group, Inc. (collectively, the "Debtors").  QSGI, Inc. ("QSGI"), QSGI-CCSI, Inc. ("QSGI-CCSI"), and Qualtech Services Group, Inc. ("Qualtech") are all Delaware corporations.

The Debtors operated as a technology services provider, offering a full suite life-cycle for its corporate and government clients' entire information technology platform.  The Debtors serviced three separate business segments: Data Center Maintenance Services; Data Security and Compliance; and Network Infrastructure Design and Support.  The Data Center Maintenance Services segment provided hardware maintenance services for enterprise-class hardware and associated peripheral products and data center consulting to companies throughout the United States.  It supported its clients' IT hardware needs through the sale of refurbished enterprise-class hardware, including mainframe and midrange processors and associate peripheral products and replacement parts.  The Data Security and Compliance segment offered data security and regulatory compliance services for end-of-life business computing Information Technology assets.  It provided solutions to companies whose business computing technologies have come to the end of their life cycle.  The Network Infrastructure Design and Support segment provided service for a full spectrum of technologies from mainframes to PCs, including network infrastructure, managed services, IP security, IP telephony and storage solutions.  The company provided its corporate, government and educational clients with these services, which included design, implementation, and monthly maintenance services on corporations' network hardware and related infrastructure, as well as round the clock monitoring and diagnostics through its North American network operating center.  Its hardware maintenance offerings, included repair/replacement of desktops, printers, and LAN components; and full service LAN/WAN design and support services.

QSGI was a vibrant and growing organization which commenced operations as Windsor Tech in 2001.  The company later merged with Delta States Oil and became a public company in 2003. From its inception, the company grew primarily organically until its first major acquisition of a mainframe hardware reseller in late 2004, Qualtech.  The acquisition of Qualtech, which cost $10 million, was used as a platform to further penetrate the reselling of mainframe (Z- Series) lower margin hardware with an eye on the higher margin around the clock maintenance services.  The company was successful in implementing its business plan and grew 28% in 2006.  However, in the early part of fiscal year 2007, a large original equipment manufacturer disallowed "feature changes" or upgrades and downgrades on used mainframe computer equipment.  This crippled the mainframe hardware reselling business, reduced sales by $9 million, caused a $7.2 million write off on the Qualtech acquisition, significantly degraded the value of the company's inventory, placed the company in violation of its loan covenants which resulted in higher interest charges and forced the company to look for a new lender, and reduced the company's market value by $25 million over the next 12 month period.

During the following 18 month period, the company searched for another acquisition target to replace the revenue and profit void.  The company believed it located such a target and acquired CCSI

in 2008.  The acquisition was financed through a $10M seller's note which required periodic interest payments at a rate of 10% and a 3 year balloon payment in year and gave the seller a secured interest in the stock of CCSI.  Furthermore, the seller was retained to run and grow the business as its divisional president reporting directly to the CEO.  Additionally, CCSI was operating out of a facility that was owned by the seller.  This left the seller with a secured interest in the stock of CCSI, the landlord to CCSI and an employee of QSGI.  QSGI started but never completed a full operational and system integration of the CCSI.  Thus, CCSI was running on legacy financial systems under full control of the seller and reporting information on a periodic basis for SEC reporting to QSGI which was then consolidated into financial reports.

Unfortunately, the acquisition came right before the general economy of the country started to deteriorate.  The economic conditions directly impacted the CCSI acquisition which went from a forecasted profit to an actual loss.  The waning financial performance left QSGI unable to make payments on the seller's note.  On June 4, 2009, the Company received notification from Mr. John Riconda that there was an Event of Default under the Subordinated Secured Convertible Note between QSGI-CCSI, Inc. and QSGI INC., on the one hand, and Mr. Riconda, on the other. As such, Mr. Riconda instructed the Escrow Agent to deliver all of the Pledged Collateral  held by the Escrow Agent pursuant to the Pledge Agreement, as the term Pledged Collateral is defined in paragraph 1, 1.1 and 1.2 of the Pledge Agreement.  As expressly set forth in the Pledge Agreement, the Pledged Collateral which the Escrow Agent should deliver to Mr. Riconda includes, but is not limited to, the Pledged Shares, which constitute 100% of the capital stock of Contemporary Computer Services, Inc. ("CCSI").   The Event of Default consists of Pledgors' failure to make required interest payments pursuant to the Note within ten (10) days of the dates on which such interest payments became due and payable.   Mr. Riconda also barred QSGI for physical access to the operation and stopped producing financial report necessary to comply with SEC reporting requirements.

In 2009, the CCSI acquisition began to unravel and the former owner of CCSI blocked all access to its operations.  The culmination of these events left the company in an untenable financial condition midway through 2009 with shrinking revenue, margins and working capital, unfavorable borrowing rates and over $23 million in obligations.

On July 2, 2009, QSGI, along with QSGI-CCSI and Qualtech, each filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Southern District of Florida.  Upon application to the Court, the Chapter 11 cases of QSGI, QSGI-CCSI and Qualtech, are being jointly administered under the case of QSGI having Case No.: 09-23658.

(Space intentionally left blank)

The following is a summary of the Debtors' financial performance since 2003:

| | Annual 2003 | Annual 2004 | Annual 2005 | Annual 2006 | Annual 2007 | Annual 2008 | Q1 2009 |
|---|---|---|---|---|---|---|---|
| Revenue | 7,484 | 22,080 | 36,386 | 46,409 | 37,221 | 34,151 | 7,196 |
| Cost of Sales | 5,492 | 16,651 | 28,886 | 36,549 | 28,043 | 26,671 | 5,933 |
| Gross Profit | 1,992 | 5,428 | 7,500 | 9,860 | 9,178 | 7,480 | 1,263 |
| | | | | | | | |
| SG&A | 1,988 | 4,836 | 8,732 | 9,664 | 9,905 | 10,983 | 2,758 |
| Interest Expense | 80 | 83 | 160 | 239 | 396 | 1,432 | 880 |
| Goodwill Charge-off | | | | | 7,207 | | |
| Depreciation and amortization | 72 | 392 | 634 | 685 | 702 | 728 | 217 |
| | | | | | | | |
| Net Income | (147) | 118 | (2,026) | (728) | (9,032) | (5,663) | (2,592) |

QSGI has 30,922,716[2] outstanding shares of common stock and 5,000,000 shares of preferred stock. QSGI has approximately 1,790 stockholders holding common stock. The stock is traded on the OTCBB as QSGIQ[3] and has had a 52 week range of $0.0001 to $0.19 per share. QSGI is not in compliance with SEC reporting requirements and has not filed the required periodic reports such as 10K's and 10Q's since the filing of the bankruptcy petition. However, the Debtors will be filing the necessary periodic reports to regain compliance with the reporting requirements of the SEC within 180 days from the date of Confirmation of the Plan of Reorganization.

**Principals and Management**

As stated above, QSGI is a publicly traded entity with approximately 1790 shareholders. QSGI-CCSI and Qualtech are wholly owned subsidiaries of QSGI. Prior to the Petition Date, the Debtors were managed by a Board of Directors consisting of Marc Sherman, as Chairman, Robert W. VanHellemont, and Geoffrey A. Smith. Directors were authorized to receive $2,500 per month in compensation. However, due to cash flow issues, compensation was only paid sporadically to the Directors. Subsequent to the Petition Date, all of the directors of the Debtors resigned with the exception of Marc Sherman, and on August 11, 2010, the following individuals were added to the Board of Directors: (i) Benee Scola, (ii) William J. Barbera, (iii) David J. Meynarez, and (iv) David K. Waldman. The current Directors are receiving options for 250,000 shares of stock each which options vest over 3 years in lieu of payment of cash compensation. If the company is able to reorganize under the Chapter 11 case and begins to operate at a profit, the board will reinstate its former policy where board members were compensated with both cash and stock.

**Background of Board of Directors**

Marc Sherman founded QSGI in August 2001 and has served as Chairman and Chief Executive Officer since then. Mr. Sherman previously served as a director and Chief Executive Officer of Intellesale, Inc. (and its predecessor, Universal Commodities Corp.) from December 1994 to July 2001. Intellesale, Inc. was a company that purchased and sold large volumes of off-lease/off finance excess, used, refurbished and "as-is" computer equipment and related products, and provided technology asset management to companies wishing to maximize the value of their computer equipment coming to the end of its useful or book lives. Prior to 1994, Mr. Sherman served in key positions in various family businesses. Mr. Sherman has over fifteen years of experience in marketing, operations and executive management.

---

[2] This figure has been adjusted by the VPC and Riconda stock being returned to the corporate treasury.

[3] Pre-bankruptcy filing the stock symbol was QSGI, and post-bankruptcy filing the stock symbol changed to QSGIQ.

Ms. Benee Scola is the president and founder of Benee Scola and Company, realtors in Harvey Cedars, Long Beach Island, New Jersey. Her company was established in 1995 and is a consistent leader in the market it serves, representing high net worth individuals. Since 1987, she has been a top producing real estate broker in Long Beach Island, New Jersey and is a successful real estate investor. She was a Board of Trustee member in 2007 and 2008 for the non-profit Long Beach Island Foundation for the Arts and Sciences in Loveladies, New Jersey. She headed the Foundation's marketing and membership committees and was elected to serve as an executive board member. She also was elected and served on the Borough Council of Surf City, New Jersey. There is no family relationship between Ms. Scola and any other officer or director of the Company and her company is not a parent, subsidiary, or other affiliate of the Company.

Mr. William J. Barbera is a CPA licensed in Pennsylvania and founder of the firm, Barbera & Associates, PC.  He has been in public practice for 20 years. He is a graduate of St. Joseph's University in Philadelphia, Pennsylvania and was a Board member of Access Services, a $24 million non-profit organization helping the mentally and physically handicapped for 6 years and was a member of their Audit committee. He has a diversified career in both corporate management and public practice. He enjoys helping small business entrepreneurs with their start-up phase and then providing the business counsel that helps them grow their businesses.  His clients range from start-up to $20 million in sales. In addition to accounting services; he specializes in tax strategies, planning and preparation. His clients include manufacturers, service providers, medical & dental practices, professional athletes and many other corporate and personal clients. There is no family relationship between Mr. Barbara and any other officer or director of the Company and his company is not a parent, subsidiary, or other affiliate of the Company.

Mr. David J. Meynarez is a CPA licensed in Florida and has served as Chief Financial Officer of KruseCom, LLC since 2009. Over the past 15 years, he has held a variety of accounting, financial and operational positions in both large multi-billion dollar publicly traded companies as well as small entrepreneurial startups, has participated in numerous M&A transactions from due diligence to integration and capital expansion projects for capacity increases and cost mitigation, has worked with and helped implement large ERP and small accounting packages and has worked at companies in technology, heavy building materials and energy industries. He started his career in public accounting at Deloitte and Touche and earned both a bachelors and masters degree in accounting from the Florida Atlantic University. There is no family relationship between Mr. Meynarez and any other officer or director of the Company.

Mr. David K. Waldman is the president and founder of Crescendo Communications, LLC, a leading New York City based investor relations firm. He has a long and successful track record working with publicly traded companies of all sizes and across a wide range of industries, including telecommunications, technology, industrial, financial, medical, and business services. He has built a reputation as a leading expert on communications best practices and has developed an extensive network on Wall Street. He has provided communications counsel to senior members of management across a wide range of issues, including M&A, management changes, earnings surprises, crisis communications, Reg-FD disclosure, etc. Prior to founding Crescendo Communications, Mr. Waldman served as vice president at a leading New York City based investor relations firm, as well as two other premier investor relations firms. Mr. Waldman also brings in-house IR experience having handled the investor relations for a multi-billion dollar satellite telecommunications company. He has a Bachelor of Science degree in Communications and Political Science from Northwestern University. There is no family relationship between Mr. Waldman and any other officer or director of the Company and his company is not a parent, subsidiary, or other affiliate of the Company.

## SIGNIFICANT PRE-PETITION BANKRUPTCY EVENTS

On February 6, 2008, Wells Fargo Bank notified the Debtors that the Debtors did not meet certain operating metrics in its credit facility for the fiscal year ended December 31, 2007. This event constituted a default under the credit facility, which resulted in Wells Fargo Bank charging the Debtors a fee of $20,000 for maintaining the existing credit facility.  Additionally, it notified the Debtors that their borrowing rate was adjusted from prime to prime plus 2.5% until such time as the Debtors could come back into compliance.

On June 5, 2008, the Debtors entered into a Senior Security Purchase Agreement with Victory Park Capital ("Victory Park"). This agreement allowed for the Debtors to borrow up to $10 million to finance both working capital needs and future acquisitions. This newer facility replaced the Debtors' $7.5 million asset based working capital facility with Wells Fargo Bank. The new revolving line of credit agreement provided for borrowings limited to the lesser of $10,000,000 or the borrowing base of 80% of eligible accounts receivable plus 50% of eligible inventory plus 60% of eligible pre-billed service receivables. The interest rate per annum charged was the greater of prime plus seven percent (7.00%) and twelve percent (12.00%). As of December 31, 2008, the Debtors had requested an overadvance and as a result were paying interest at fifteen percent (15%) per annum, with all principal and interest becoming due on December 1, 2010.  As of the Petition Date, the Debtors, jointly and severally, were indebted to Victory Park in the approximate amount of no less than $6,331,816.00 plus interest, costs and attorneys fees (the "Pre-Petition Loan"). To secure the Pre-Petition Loan, the Debtors granted Victory Park a first priority lien and security interest in and upon substantially all of the Debtors' assets, including but not limited to, all real and personal property of the Debtors and the proceeds and products thereof.

The Debtors are not aware of any other pre-petition guarantors.

## SIGNIFICANT POST-PETITION EVENTS IN THE CHAPTER 11 REORGANIZATION CASE

### Employment of Professionals

The Debtors made application to the Court on July 6, 2009 for authorization to retain Bradley S. Shraiberg and Shraiberg, Ferrara & Landau, P.A. as attorneys for the Debtors.  On July 7, 2009 the Court entered an Interim Order Approving the employment of Debtors' attorney.  Subsequently, the Debtors filed an Application for Substitution of Debtors' Bankruptcy Counsel from Shraiberg, Ferrara & Landau, P.A. to Michael A. Kaufman, P.A. pursuant to 11 U.S.C. § 327(A), *Nunc Pro Tunc* to August 10, 2010.  On September 22, 2010, the Court entered an Order Approving the substitution of Michael A. Kaufman, P.A. for Shraiberg, Ferrara & Landau, P.A. as Debtors' attorney.  On July 16, 2009, the Debtors filed an Application to Employ Richard Cartoon and Kinetic Advisors, LLC to provide restructuring advisory services to the Debtors. The Application was approved on August 6, 2009 *nunc pro tunc* to July 13, 2009.   The payment of Ricard Cartoon and Kinetic Advisors, LLC's fees are subject to fee application and approval by the Court.

There is an outstanding balance owed to Shraiberg, Ferrara & Landau, P.A. in the amount of $71,709.03.  Said balance will be paid by applying the amount of $9,079.42 from the professional fee carve-out made by Victory Park Management, LLC.  In addition, Victory Park still owes the amount of $955.88 towards the professional fee carve-out which will also be applied to the outstanding balance owed to Shraiberg, Ferrara & Landau, P.A.  Upon confirmation of the Debtors' proposed Plan of Reorganization interest on the remaining balance owed to Shraiberg, Ferrara & Landau, P.A. will begin

to accrue at the rate of eight (8%) percent per annum and shall be paid in eight (8) equal installments commencing 120 days from the Effective Date of Debtors' Plan of Reorganization.

The form of payment of the attorneys fees of Michael A. Kaufman, P.A. by way of equity in the Reorganized Debtor is subject to Court approval. Debtors have proposed to pay the firm of Michael A. Kaufman, P.A. by assigning 1.5% percent of the common stock in the Reorganized Debtor with a one year holding period or 115% of the total outstanding legal fees owed to Michael A. Kaufman, P.A. to be paid within one year of the date of Confirmation of the Debtors' Plan of Reorganization. Michael A. Kaufman, P.A. has the sole discretion as to either payment method subject to Court approval. In the event Debtors' proposed Plan of Reorganization is not confirmed, Michael A. Kaufman, P.A. will be entitled to an administrative claim. The Debtors have selected the firm of Michael A. Kaufman, P.A., because of the firm's acceptance of the Debtors' proposed payment arrangement and the firm's experience with Chapter 11 reorganization cases.

The Debtors have made application to the Court for the authority to retain the services of Fildew Hinks, PLLC as special SEC counsel on August 27, 2010 and refiled the application on September 15, 2010. The Debtors' application to employ Fildew Hinks, PLLC was approved on October 7, 2010 in Court and an Order will be entered shortly.

## Post-Petition Financing

On August 21, 2009, the Court entered the *Stipulation and Final Order (I) Authorizing Secured Post-Petition Financing on a Superpriority Basis Pursuant to 11 U.S.C. § 364, and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364* ("Financing Order") authorizing the Debtors to borrow additional funds from Victory Park Capital post-petition, to use cash collateral and to grant post-petition liens, security interests, superpriority claims and adequate protection to Victory Park.

Pursuant to the Financing Order, Victory Park provided the Debtors additional borrowings, in accordance with Approved Budgets (as defined in the Financing Order), on a revolving basis up to an aggregate amount of $500,000, to the extent required for the Debtors' operations, and which amount may be increased to an aggregate amount of $750,000 in the Victory Park's sole discretion (the "Post-Petition Loan").

The proceeds of the Post-Petition Loan were to be used for: (a) general working capital purposes in the ordinary course of business; and (b) the administration of each chapter 11 Case, all in accordance with the Approved Budgets pursuant to the Financing Order.

Under the Financing Order, Victory Park Capital was granted a security interest and liens pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code in all currently owned or hereafter acquired property and assets of each of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, all cash, goods, accounts receivable, inventory, cash in advance deposits, general intangibles, goodwill, investment property (including, without limitation, ownership interests in corporations, partnerships, and limited liability companies), deposit accounts, real estate, intellectual property, machinery, equipment, fixtures, leasehold interests, trademarks, trade names, licenses, leases and lease interests, causes of action excluding, any actions and recoveries thereon against third parties, tax refund claims, commercial tort claims and insurance proceeds, and the proceeds, products, rents and profits of all of the foregoing (all of the foregoing, the "Collateral"), subject only to, in the event of the termination of the post petition DIP Facility, the payment of the DIP Carve Out (as defined in the Financing Order).

**Sale of Substantially all of Debtors' Assets**

On September 9, 2009, the Bankruptcy Court entered the *Order Granting In Part and Denying In Part Debtors' Emergency Motion for Entry of an Order (A) Authorizing and Scheduling the Sale of Substantially All of the Assets of the DSC division of QSGI Free and Clear of All Liens, Claims, and Encumbrances; (B) Approving Bidding Procedures and Stalking Horse Protections; (C) Approving the Notice of Sale; (D) Scheduling an Auction to Accept Higher and Better Bids; and (E) Scheduling Hearing to Approve Sale Arising Out of Auction Pursuant to 11 U.S.C. § 363* (the "DSC Sale").

Victory Park was the successful bidder at the DSC Sale auction by way of its credit bid of $500,000, and on September 24, 2009, the Bankruptcy Court authorized the DCS Sale to Victory Park and entered the *Order Pursuant to 11 U.S.C. §§ 105, 363 and 365 of the Bankruptcy Code (A) Approving the Sale of Substantially All of the Assets of the DSC Division of QSGI, Inc. Free and Clear of all Liens, Claims and Encumbrances and Interests; (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* ("DSC Sale Order").

Pursuant to the DSC Sale Order, Victory Park agreed to carve-out from its secured collateral the following sums: (i) $50,000 for the general unsecured creditors of the Debtors (the "Unsecured Carve-Out"); (ii) $127,000 for non-Professional administrative expenses (the "Administrative Claim Carve-Out"); and (iii) $260,000 for the Bankruptcy Court approved fees and expenses of Debtors' former counsel, Shraiberg, Ferrara & Landau, P.A. and restructuring consultants, Kinetic Advisors (the "Professional Carve-Out").

On September 15, 2009, the Bankruptcy Court entered the *Order Granting in Part and Denying in Part Debtors' Emergency Motion for Entry of an Order (A) Authorizing and Scheduling the Sale of Substantially All of the Assets of the DCM Division of Qualtech Services Group, Inc. Free and Clear of All Liens, Claims and Encumbrances; (B) Approving Bidding Procedures and Stalking Horse Protections; (C) Approving the Notice of Sale; (D) Scheduling an Auction to Accept Higher and Better Bids; and (E) Scheduling Hearing to Approve the Sale Arising Out of Auction Pursuant to 11 U.S.C. § 363* ("DCM Sale").

SMS Maintenance, LLC was the successful bidder at the DCM Sale auction by way of its asset purchase agreement of $2.45 million, plus an additional $20,000 payment to partially offset pre-closing payroll expenses, and on September 24, 2009 the Bankruptcy Court entered the *Order Pursuant to 11 U.S.C. §§ 105, 363 and 365 of the Bankruptcy Code (A) Approving the Sale of Substantially All of the Assets of the DCM Division of Qualtech Services Group, Inc. Free and Clear of Liens, Claims, Encumbrances and Interests; (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* ("DCM Sale Order").

Upon the closing of the DSC Sale and the DCM Sale, the Debtors ceased substantially all business operations.

**Anticipated Future of the Company.**

Under the proposed Reorganization Plan, Debtor QSGI, Inc. shall be reorganized and continue in existence as a publicly traded entity pursuant to the restructuring plan set forth in Article 6 and 7 of the Reorganization Plan as the Reorganized Debtor. The purpose of the restructuring plan is to create a marketable entity which shall merge with another entity, KruseCom, LLC, at a later date, pending. KruseCom, LLC provided an initial proposed Plan and Disclosure Statement to Debtors which was

prepared by KruseCom, LLC's counsel, McDonald Hopkins. The initial proposed Plan and Disclosure Statement has undergone numerous revisions to encompass necessary changes by the Debtors' current counsel.

KruseCom, LLC is a Florida limited liability company started by present and former insiders of the Debtors, in September 2009. KruseCom, LLC has eight (8) employees, and is generating revenues of $5 million per year and is a profitable, financially viable and operationally strong company. For the past twelve (12) months, KruseCom, LLC has been providing financial support and business services for the benefit of the Debtors and its Estates. The merger with KruseCom, LLC. is subject to the tax free stock exchange which the outside Board of Directors of QSGI, Inc., and KruseCom, LLC Members have approved.

Pursuant to the Reorganization Plan, pending receipt of all SEC periodic reports , holders of Allowed General Unsecured Claims shall receive a pro-rata Distribution of $1,000,000 in value of Additional Common Stock in the Reorganized Debtor, or up to a maximum aggregate of 10,000,000 shares of Additional Common Stock. The value of the Additional Common Stock shall be based upon the 5-day trading price average of Debtors shares as traded on the public market the week prior to the Effective Date of the Reorganization Plan. KruseCom, LLC, in exchange for providing the capital and necessary assets to implement the restructuring transactions and the Reorganization Plan, shall receive 190,000,000 shares of stock in the Reorganized Debtor. Up to 2,250,000 shares of common stock in the Reorganized Debtor shall be reserved for issuance to key third parties which the Reorganized Debtor believes valuable to the implementation and completion of the Reorganization Plan and the future success of the Reorganized Debtor. The balance of the common stock shares of the Reorganized Debtor are to be retained by current Equity Interest holders.

<u>Issuance of Additional Common Stock</u>. Upon the Effective Date, the Reorganized Debtor shall be authorized to issue up to 2,000,000,000 shares of common stock. Notwithstanding the total number of shares authorized to be issued, as soon as is practicable after the Effective Date, the Reorganized Debtor shall issue up to (i) 10,000,000 shares (or such number of shares of Additional Common Stock with aggregate value of no more than $1,000,000) of Additional Common Stock to the holders of Allowed General Unsecured Claims; (ii) 190,000,000 shares of Additional Common Stock to KruseCom, LLC, (iii) up to 2,250,000 shares of Additional Common Stock for issuance to key third parties vital to the ongoing success of the Reorganized Debtor ("Key Third Parties"), (iv) up to 425,000 shares of Additional Common Stock to present holders of preferred shares in the Debtors, (v) Michael A. Kaufman, P.A. will have 1.42% of the shares and (vi) up to 10,000,000 shares for working capital in the Reorganized Debtor, so that the following approximate capital structure of the Reorganized Debtor shall be effectuated:

Capital Structure:

|  | Effective Date | Fully Diluted |
|---|---|---|
| KruseCom | 80.96% | 76.95% |
| Legacy Common Stockholders | 13.18% | 12.52% |
| Unsecured Creditors | 4.26% | 4.05% |
| Convertible Preferred | 0.18% | 0.17% |
| Michael A. Kaufman, P.A.[4] | 1.42% | 1.35% |
| Key third party | 0.00% | 0.91% |
| Working Capital Stock Issuance | 0.00% | 4.05% |

---

[4] Subject to a final fee application and approval by the Court.

QSGI, Inc.
Equity Ownership
Before and After Reorganization Plan

| | Before Transaction | Ownership | | After Transaction | Ownership |
|---|---|---|---|---|---|
| Authorized | 95,000,000 | | | 2,000,000,000 | |
| KruseCom | - | 0.00% | | 190,000,000 | 80.19% |
| Legacy Common Stockholders | 30,922,716 | 100.00% | | 30,922,716 | 13.05% |
| Unsecured Creditors | - | 0.00% | | 10,000,000 | 4.22% |
| Convertible Preferred | - | 0.00% | | 425,000 | 0.18% |
| Professional Services | - | 0.00% | | 3,330,000 | 1.41% |
| Key third party | - | 0.00% | | 2,250,000 | 0.95% |
| Total Outstanding | 30,922,716 | | | 236,927,716 | 100.0% |

After issuance of the Additional Common Stock, the Reorganized Debtor is authorized, and may in its sole discretion and without any further notice or shareholder approval, perform up to a reverse 50:1 stock split in order to reduce the total number of shares outstanding in the Reorganized Debtor ("Stock Split"). For example the effect of a reverse 20:1 Stock Split would be to reduce the total number of issued shares in Reorganized Debtor from approximately 236,928,000 shares to 11,846,386 shares. The Stock Split would not affect the overall capital structure of the Reorganized Debtor.

QSGI, Inc.
Equity Ownership
Before and After Reorganization Plan
With Hypothetical 20:1 Reverse Dividend

| | Before Transaction | Ownership | | After Transaction | Ownership |
|---|---|---|---|---|---|
| Authorized | 4,750,000 | | | 100,000,000 | |
| KruseCom | | 0.00% | | 9,500,000 | 80.19% |
| Legacy Common Stockholders | 1,546,136 | 100.00% | | 1,546,136 | 13.05% |
| Unsecured Creditors | | 0.00% | | 500,000 | 4.22% |
| Convertible Preferred | | 0.00% | | 21,250 | 0.18% |
| Professional Services | | 0.00% | | 166,500 | 1.41% |
| Key third party | | 0.00% | | 112,500 | 0.95% |
| Total Outstanding | 1,546,136 | | | 11,846,386 | |

As part of the Plan, subsequent to the approval of the Court, QSGI as soon as practicable after the merger with KruseCom, Inc. intends to sell up to 10,000,000 shares of its common stock to raise additional operating capital and for other general corporate purposes at prices to be determined at the time of sale.

There is currently on deposit in the Trust Account of Michael A. Kaufman, P.A., the amount of $50,000.00 which has been set aside for distribution to the General Unsecured Creditors by way of Court Order. Upon the effective date of the Debtors' Plan of Reorganization, said amount will be released by Michael A. Kaufman, P.A. to the Reorganized Debtors to be utilized as operating capital. The firm of Michael A. Kaufman, P.A., will be duly authorized to make such transfer upon confirmation of the Debtors' Plan of Reorganization and no further application to the Court will be necessary for such authority.

The Debtors are exempted from Securities Laws. The Estates of QSGI-CCSI, Inc. and Qualtech Services Group, Inc. shall be fully liquidated under the Reorganization Plan on the Effective Date of the Plan. QSGI-CCSI, Inc. and Qualtech Services Group, Inc. will be fully dissolved and will no longer be active corporations.

**Post-Petition Transfers**

An unauthorized post-petition transfer was made from the Debtors' DIP account in the amount of $60,000.00 to N-1 Technologies, Inc., post-petition and without bankruptcy approval.   In addition, there were multiple post-petition transfers with an aggregate value of approximately $10,000.00 to N-1 Technologies, Inc.  The Debtors believe these payments are avoidable as unauthorized post-petition transfers pursuant to 11 U.S.C. § 549. Debtors disclose that litigation will be initiated against N-1 Technologies, Inc. in order to recover the aforementioned payment on behalf of the Reorganized Debtor.

**Post-Petition Litigation; Other Events of Significance**

Victory Park Management, LLC and Victory Park Capital Advisors, LLC (collectively "VPC") made claims against QSGI regarding including pre-petition overstatements of inventory valuation and post-petition interference with the sale process of the assets.  On April 14, 2010, QSGI, settled its dispute with VPC and signed a Settlement Agreement and Mutual Release. Although the Debtors disputed all claims, the Debtors (in conjunction with their insurer) settled with VPC after considering the total cost of litigation. Other than an obligation to pay $150,000 if QSGI is ultimately reorganized, the settlement releases the Debtors from any and all claims VPC may have against them. The settlement with VPC was approved by the Bankruptcy Court pursuant to its Order Approving Expedited Amended Joint Motion for Approval of Settlement Agreement between Debtors and Victory Park Management, LLC pursuant to Fed.R.B.P. 9019 which was entered May 27, 2010.  In addition to the terms of the settlement document, VPM will not object to, vote against, or directly or indirectly propose a competing or alternative plan of reorganization of and for any debtor in the Bankruptcy Cases.  This foregoing language of the settlement document deems that the Class of Victory Park Management, LLC has accepted the plan. The amount of 4,125,000 shares of restricted stock will be deemed returned by VPC to the corporate treasury of the Debtor upon confirmation of the Plan of Reorganization and VPC will not receive any additional distribution under the Debtors' Plan of Reorganization.  No further action will be required by the Reorganized Debtors.

In addition, a settlement agreement and mutual release was entered into by and between John Riconda, on one hand, and QSGI INC., on the other to settle asserted claims by both parties against each other in June 2010.  On July 2, 2010, a joint motion for approval of settlement agreement between debtors and John Riconda pursuant to Fed.R.BankR.P. 9019 and Local Rule 9013-1(D) was filed with the United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division to approve the terms of the settlement agreement between Debtors and John Riconda.  The motion was approved by the Bankruptcy Court on August 9, 2010.  In addition to the terms of the settlement document, Riconda shall support and not object to any plan or proposed plan of reorganization for QSGI filed in the Bankruptcy Proceeding, even if in said plan he receives disparate or different treatment than other similarly situated creditors of QSGI. Riconda will not receive a cash payment on his claim or equity in the re-organized entity. This foregoing language of the settlement document deems that the Class of John Riconda has accepted the plan.  The amount of 13,500,000 shares of restricted stock will be deemed returned by Riconda to the corporate treasury of the Debtor upon confirmation of the Plan of

Reorganization and Riconda will not receive any additional distribution under the Debtors' Plan of Reorganization. No further action will be required by the Reorganized Debtors.

**Preservation of Causes of Action**

Except as otherwise provided in the Plan or the Confirmation Order or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with Section 1123(b) of the Bankruptcy Code, the Reorganized Debtor will retain for its own benefit and may pursue, not pursue, settle, release, or enforce, in its sole and absolute discretion, all claims, rights or Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person, including Causes of Action arising under Chapter 5 of the Bankruptcy Code. The Debtor is not currently in a position to express an opinion on the merits of any Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. No claim, right or Causes of Action, suit or proceeding shall, under any circumstances, be waived as a result of the failure of the Debtor to describe same with specificity in the Plan or the Disclosure Statement. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any *res judicata*, collateral estoppel or other preclusive effect which would precede, preclude, or inhibit prosecution of such claims, rights or Causes of Action, suits and proceedings following Confirmation of the Plan. The recoveries of any Causes of Action shall be deposited in the Reorganized Debtor's bank accounts and used to pay operating expenses. The Debtors hereby disclose that there is a potential cause of action against IBM, Inc., and its affiliated companies based regarding IBM's refusal to allow Debtors to modify certain mainframe computers to comply with customer needs. The Debtors retain their right to pursue this cause of action and any moneys recovered as a result of the litigation will be deposited into the Reorganized Debtors' bank accounts and used for operating costs of the Debtors. It is further disclosed that the initiation of such litigation against IBM, Inc. will consist of an extraordinary amount of time expended by a law firm requiring that any agreement for services be on a contingent basis. The Debtors have been advised by potential counsel that the statute of limitations for this cause of action will expire in 2011. The Debtors are actively seeking counsel that will pursue this cause of action on behalf of the Debtors on a contingency basis.

**Liquidation Analysis**

Pursuant to the Debtors' schedules filed pursuant to Bankruptcy Rule 1007, there are total unsecured claims against the Debtors' Estates in the amount of approximately $16.3 million dollars. The Debtors and/or the Reorganized Debtor, however, reserve the right to amend, dispute and/or object to any scheduled Claim or Proof of Claim of any party under the Reorganization Plan.

Taking into account the foregoing, if the Reorganization Plan is not confirmed, the only available liquid assets for recovery and distribution by a chapter 7 trustee are set forth on the Liquidation Analysis spreadsheet attached hereto as Exhibit A.

However, after payment of: (i) the costs of chapter 7 administrative fees, expenses, and the costs of liquidating the available assets; (ii) allowed outstanding chapter 11 administrative expenses; and (iii) allowed priority unsecured claims, the Debtors believe the only funds likely to be available to make a distribution to on account of allowed general unsecured claims would be the $50,000 unsecured

carve-out, which translates to a distribution to allowed general unsecured claims of less than one percent (1%).

Under the Reorganization Plan, however, allowed general unsecured claims will be issued up to a maximum amount of 10,000,000 shares of common stock in the Reorganized Debtor, up to an aggregate value, as of the Effective Date, of $1,000,000. The Debtors' shares are presently trading on OTCBB as QSGIQ and has had a 52 week range of $0.0001 to $0.19 per share. The Debtors expect that the value of the stock upon the consummation of the merger with KruseCom, Inc., an operating company, along with the full implementation of the Restructuring Transaction set forth in the Reorganization Plan, will provide investors with the opportunity to enjoy an increase the value of their investment. Given the foregoing, if the Reorganization Plan is confirmed and the Restructuring Transaction implemented, allowed general unsecured claims may receive a distribution of fifteen (15) times the value or more on account of their allowed claims. Parties should be aware, however, that the value of securities may fluctuate based upon a variety of factors, and therefore there is a risk that the securities may substantially diminish in value or have no value over time.

Notwithstanding, the Debtors believe that acceptance of the Reorganization Plan is in the best interests of the Estate and its creditors, as it will allow for the greatest possible recovery.

## SUMMARY OF THE PLAN

### General Overview of the Plan Treatment of Claims and Equity Interests

Except as otherwise provided below, each Holder of an Allowed Administrative Expense Claim shall be paid (a) on the Effective Date, an amount, in Cash equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtor, or (c) as otherwise ordered by order of the Bankruptcy Court

All fees and charges assessed against the Estate under Chapter 123 of Title 28 of the United States Code, 28 U.S.C. §§ 1911-1930, through the Effective Date shall be paid to the United States Trustee by the Reorganized Debtor by no later than thirty (30) days following the Effective Date. At the time of such payment, the Reorganized Debtor shall provide to the United States Trustee an appropriate affidavit indicating the disbursements for the relevant periods. Following the Effective Date, any such fees required pursuant to 28 U.S.C. § 1930(a)(6) arising or accruing from distributions made by the Reorganized Debtor or made under the Plan shall also be paid by the Reorganized Debtor. All such payments to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) based upon the applicable disbursements for the relevant post-confirmation periods and shall be made within the time period set forth in 28 U.S.C. § 1930(a)(6) until the earlier of (i) the closing of the Reorganization Case by the issuance of a Final Order by the Bankruptcy Court on the Final Decree Date, or (ii) the entry of an order by the Bankruptcy Court dismissing the Reorganization Case or converting the Reorganization Case to another chapter under the Bankruptcy Code. The Reorganized Debtor shall provide to the United States Trustee at the time of each post-confirmation payment an appropriate affidavit indicating the disbursements for the relevant periods.

All Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Bankruptcy Case shall be paid by the Reorganized Debtor in the ordinary course of business in accordance with contract terms or as may be otherwise agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtor or the Reorganized Debtor.

**Priority Tax Claims**

Each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtor, payment in full or regular installment payments in Cash in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. Notwithstanding the above, each Holder of an Allowed Priority Tax Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtor, as the case may be.

**<u>Unclassified Claims</u>**

As provided in Bankruptcy Code §1123(a)(1), Administrative Claims and Priority Tax Claims are not classified for purposes of voting on, or receiving distributions under, this Plan. Holders of Administrative Claims and Priority Tax Claims are not entitled to vote on this Plan but, rather, are treated separately in accordance with Article 3 of the Plan and under Bankruptcy Code §1129(a)(9)(A).

**Class 1: Allowed Priority Claims**

Class 1 consists of all Priority Claims. Each Holder of an Allowed Priority Claim shall be paid (a) on the Effective Date, an amount, in Cash by the Reorganized Debtor equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B) of the Bankruptcy Code, (b) as otherwise agreed to by the Debtor and the Holder of an Allowed Priority Claim, or (c) as otherwise ordered by a Final Order of the Bankruptcy Code.

Class 1 is not Impaired, and the holders of Class 1 Allowed Claims are deemed to have accepted the Reorganization Plan.

**Class 2:  Allowed Claim of Victory Park**

Class 2 consists of the Allowed Claim of Victory Park. Contingent upon entry of the Confirmation Order, Victory Park shall have an Allowed Claim in the amount of $150,000 against the Reorganized Debtor (the "Post Confirmation Claim"), which Post Confirmation Claim shall accrue interest at eight percent (8%) per annum and be paid in eight (8) equal installments commencing 120 days after the Confirmation Date, and continuing each 90 days thereafter until paid in full in cash. Upon payment in full of the Post Confirmation Claim, including interest thereon, all Liens, claims and interests of Victory Park in the Debtor's corporate shell, and any other Assets or stock of the Debtors or the Reorganized Debtor shall be waived, released and terminated. Victory Park shall not be entitled to any other Distributions or payments of any kind but for the Post Confirmation Clam. The amount of 4,125,000 shares of restricted stock will be deemed returned by VPC to the corporate treasury of the Debtor upon confirmation of the Plan of Reorganization and VPC will not receive any additional distribution under the Debtors' Plan of Reorganization. No further action will be required by the Reorganized Debtors.

Class 2 is Impaired.

**Class 3:  Allowed Claim of John Riconda**

Class 3 consists of the Allowed Claim(s) of John Riconda ("Riconda") pursuant to the Riconda Settlement. As set forth in the Riconda Settlement, Riconda holds an Allowed Unsecured Claim against QSGI, Inc. in the amount of $10,159,000. However, pursuant to the Riconda Settlement, Riconda shall not be entitled to any Distributions, payments or other interests under the Reorganization Plan or in the Reorganized Debtor on account of his Allowed Claim.  The amount of 13,500,000 shares of restricted stock will be deemed returned by Riconda to the corporate treasury of the Debtor upon confirmation of the Plan of Reorganization and Riconda will not receive any additional distribution under the Debtors' Plan of Reorganization.  No further action will be required by the Reorganized Debtors.

Class 3 is Impaired.

**Class 4:  Allowed General Unsecured Claims**

Class 4 consists of all Allowed General Unsecured Claims. Unless the Debtors or the Reorganized Debtor and the holder of such Allowed General Unsecured Claim agree to a different treatment, and subject to the provisions of this Reorganization Plan, each holder of an Allowed General Unsecured Claim shall receive a pro-rata Distribution of $1,000,000 in value of Additional Common Stock in the Reorganized Debtor, or up to a maximum aggregate of 10,000,000 shares of Additional Common Stock.  The value of the Additional Common Stock shall be based upon the 5-day trading price average of Debtors shares as traded on the public market the week prior to the Effective Date of the Reorganization Plan.

Class 4 is Impaired.

**Class 5: Equity Interests and Claims**

Class 5 consists of all Equity Interests and Claims of preferred shareholders.

Preferred stockholders:  Under the Reorganization Plan, the present lawful owners of preferred stock in the Debtors shall have their shares converted to an aggregate of 425,000 shares of common stock in the Reorganized Debtor, to be distributed pro-rata among the preferred shareholders.  The preferred shareholders are Pike Capital Partners, LP and Guerilla Partners, LP.

Class 5 is Impaired.

**Class 6: Equity Interests and Claims**

Common Stockholders and other Equity Interests: The lawful holders common stock in the Debtors and all other Equity Interests and Claims shall retain all common stock and Equity Interests under the Reorganization Plan.

Class 6 is Impaired.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Assumption and Rejection of Certain Executory Contracts and Leases.**

Pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that existed between the Debtor and another Person or Entity as of the Petition Date shall be deemed rejected by the Debtor as of the later of sixty (60) days after the Effective Date or December 1, 2010 (collectively the "Rejected Contracts"), except for key insurance policies and other contracts at Debtor's sole discretion.  A party may request in writing from Debtors' counsel, confirmation as to whether that party's contract is being rejected or accepted by the Debtor within ten (10) days from the date of approval of Debtor's proposed Disclosure Statement in order to file a proof of claim consistent with the Plan and Disclosure Statement.

## Cure Claims from Assumption and Damages Arising from Rejection of any Executory Contract or Unexpired Leases.

Any Claim for actual or possible cure arising by reason of the pending or potential assumption of any executory contract or unexpired lease not previously assumed pursuant to order of the Bankruptcy Court or where there is pending before the Bankruptcy Court on the Confirmation Date ("Cure Claim") must be filed with the Bankruptcy Court thirty (30) days following the Confirmation Date and served upon the Debtor or such Claim shall be forever barred and unenforceable against the Debtor.  Any Claim for damages arising by reason of the rejection of any executor contract or unexpired lease must be filed with the Bankruptcy Court thirty (30) days following the filing of the list of Rejected Contracts and served upon the Reorganized Debtor or such Claim shall be forever barred and unenforceable against the Reorganized Debtor.  Such Claims, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Class 6 Allowed Claims.  The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith. The Debtor reserves the right to file motions to assume or reject any unexpired lease or executory contract not specifically listed in the Plan.

## MEANS OF IMPLEMENTATION OF THE PLAN

## General Overview.

The general structure of the reorganization effort in the Reorganization Case involves a stand-alone plan of reorganization pursuant to which the Debtor shall continue to operate post-confirmation as the Reorganized Debtor.

## Continued Corporate Existence: Tax Consequences

The Debtor will continue to exist after the Effective Date.  Debtor will continue as a corporation with all of the powers of a corporation under Delaware law and pursuant to its shareholder's agreement or other organizational documents in effect prior to the Effective Date, without prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date.

**Corporate Action**

All matters provided for under the Plan involving corporate structure of the Debtors or the Reorganized Debtor or any corporate action to be taken by or required of the Debtors or the Reorganized Debtor, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the Directors of the Debtors or the Reorganized Debtor.

**Section 1145 Exemption from Securities Law**

The Debtor, Reorganized Debtor or its affiliates or successors are exempt from registration requirements of federal and state securities laws pursuant to 11 U.S.C. 1145.

**Section 1146 Exemption**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any security or the making, delivery or recording of any instrument of transfer pursuant to, in implementation of or as contemplated by the Plan or any Plan Document (including documents associated with the sale of shares), or the revesting, transfer of sale of any real or personal property of, by or in the Debtors or the Reorganized Debtor pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by the Plan or related to the foregoing, shall not be subject to any document recording tax, stamp, tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Term of Certain Injunctions and Automatic Stay**

Except as otherwise ordered by this Court, all injunctions or automatic stays provided for in the Reorganization Case pursuant to section 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date. Any preliminary or permanent injunction entered by the Bankruptcy Court shall continue in full force and effect following the Confirmation Date and the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

**No Liability for Tax Claims**

Unless a taxing Governmental Authority has asserted a Claim against the Debtors before the Bar Date or Administrative Expense Claims Bar Date established therefore, no Claim of such Governmental Authority shall be Allowed against the Debtor or the Reorganized Debtor or their respective members, officers or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtors, any of its Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise

tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

## Retention of Jurisdiction

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Court shall retain exclusive jurisdiction of all matters arising out of or relating to the Case, the Reorganization Plan, the Confirmation Order, and the Estate pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a) To resolve any matters relating to the assumption and assignment or rejection of executory contracts or unexpired leases, and to hear, determine and, if necessary, liquidate any Claims resulting therefrom;

(b) To decide and resolve any and all motions, adversary proceedings, objections to Claims, including Causes of Action, Estate Litigation, applications, contested matters and any other matters, whether pending as of the Effective Date or brought thereafter in accordance with the terms hereof;

(c) To consider and rule on the compromise and settlement of any Claim, Disputed Claim, Cause of Action or Estate Litigation on behalf of the Debtors or their Estate;

(d) To ensure that Distributions to holders of Allowed Claims are accomplished as provided herein, and resolve any disputes concerning any such Distributions;

(e) To allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim (including any Administrative Expense Claim), and to resolve any and all objections to the Disputed Claims;

(f) To hear and determine any and all applications for the allowance of compensation of Professionals for professional services rendered and expenses incurred prior to the Confirmation Date;

(g) To enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Reorganization Plan, and all contracts, instruments, releases and other agreements or documents created in connection with the Reorganization Plan;

(h) To consider any modifications to the Reorganization Plan, to cure any defect or omission, or reconcile any inconsistency, in the Reorganization Plan or in any order of the Court as may be necessary to carry out the purposes and intent of the Reorganization Plan and to implement and effectuate the Reorganization Plan;

(i) To resolve any cases, controversies, suits or disputes arising in connection with the interpretation, implementation, or enforcement of the Reorganization Plan, or any person's or Entity's obligations incurred in connection with the Reorganization Plan;

(j) To hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(k) To enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, revoked, reversed or vacated;

(l) To enforce remedies upon any default under the Reorganization Plan;

(m) To enforce, interpret, and determine any disputes arising in connection with any orders, stipulations, judgments, and rulings entered in connection with the Case (whether or not the Case has been closed);

(n) To resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Reorganization Plan, or any Estate obligations incurred in connection herewith;

(o) To determine any other matters that may arise in connection with or relate to the Reorganization Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Reorganization Plan;

(p) To issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any person or Entity with the consummation of the Reorganization Plan, or the enforcement of any rights, remedies, or obligations created under the Reorganization Plan;

(q) To determine such other matters as may be provided for in the Confirmation Order or other orders of the Court or as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(r) To hear any other matters if the Court's exercise of jurisdiction thereover is not inconsistent with the Bankruptcy Code or Title 28 of the United States Code;

(s) To hear and determine issues relating to discharge, releases, injunctions, covenants not to sue, and other waivers and protections provided under or relating to the Reorganization Plan;

(t) To recover all Assets of the Debtors' Estate (excepting those Assets transferred pursuant to the Sale Order); and

(u) To enter a final decree closing the Case.

**Modification or Withdrawal of the Plan**.

The Plan provides that the Debtor, in its sole and absolute discretion, may modify or withdraw the Plan at any time prior to the entry of the Confirmation Order.

## VOTING ON AND CONFIRMATION OF THE PLAN

**Confirmation and Acceptance by All Impaired Classes**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all of the requirements of the Bankruptcy Code Section 1129 are met. Among the requirements for confirmation of a plan are that the plan be accepted by all impaired classes of claims and equity interests, and satisfaction of the matters described below.

*Feasibility*.  A plan may be confirmed only if it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor.  The Debtor believes that it will be able to perform its obligations under the Plan without further financial reorganization.

The Plan basically provides for payment to Holders of Allowed Claims, including contingent, unliquidated and Disputed Claims to the extent they become Allowed Claims, in the order of their priority.  At the present time, the Debtor believes that sufficient funds will be available to fund the payments required under the Plan to the Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals), Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Secured Claims and Allowed Unsecured Claims on a *pro rata* basis to the extent set forth in the Plan.  Accordingly, the Debtor believes that the Plan is feasible *per se*.

The obligations under the Plan to Holders of contingent, unliquidated and Disputed Claims cannot be ascertained without the determination of the validity and amount of those Claims by the Bankruptcy Court.  Until the Claims determination process is complete, the exact amount to be received by Unsecured Creditors cannot be ascertained.

*Best Interests Standard*.  The Bankruptcy Code requires that the Plan meet the "best interest" test which requires that members of a Class must receive or retain under the Plan, property having a value not less than the amount which the Class members would have received or retained if the Debtor was liquidated under Chapter 7 on the same date.  The Debtor believes that distributions to all Impaired Classes of Claims in accordance with the terms of the Plan would exceed the net distribution that would otherwise take place in Chapter 7.

**Confirmation Without Acceptance by All Impaired Classes**

If one or more of the Impaired Classes of Claims or Equity Interests does not accept the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Class under the "cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes under the Plan.

*Discriminate Unfairly*.  The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank.  The Debtor believes that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no Class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank.

*Fair and Equitable Standard*.  The "fair and equitable" standard, also known as the "absolute priority rule" requires that a dissenting class receive full compensation for its allowed claims or interests before any junior class receives any distribution.  The Debtor believes the Plan is fair and equitable to all Classes pursuant to this standard.

With respect to the Impaired Class of Unsecured Claims, Bankruptcy Code Section 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each Holder of a Claim of such a class receives or retains on account of such claim, property of a value as of the effective date of the plan equal to the allowed mount of such claim; or (ii) the Holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the

plan on account of such junior claim or interest.  The Debtor believes that the Plan meets these standards.

Accordingly, if necessary, the Debtor believes that the Plan meets the requirements for Confirmation by the Bankruptcy Court, notwithstanding the non-acceptance by an Impaired Class of Claims.

The Debtor intends to evaluate the results of the balloting and determine whether to seek Confirmation of the Plan in the event that less than all the Impaired Classes of Claims do not vote to accept the Plan.  The determination as to whether to seek Confirmation under such circumstances will be announced before or at the Confirmation Hearing.

**Absolute Priority Rule**

The Bankruptcy Code and other applicable law establish priority for distribution of funds in bankruptcy cases.  These priority provisions are sometimes referred to as the "absolute priority" rule.  Normally, and subject to exceptions not relevant here, valid secured claims are first paid to the extent of the amount of the claim or the value of the claimant's collateral (if less than the claim).

Any property in the bankruptcy estate, net of the valid secured claims described above, is first distributed to holders of priority claims, including (a) the costs of administering the bankruptcy case, including the cost of operating the Debtor's business during the Reorganization Case; (b) certain wage and benefit claims; and (c) the remaining funds until paid in full.  Equity holders (i.e., stockholders) are paid only after all creditors have been paid.

**Non-Confirmation of the Plan**

If the Plan is not confirmed by the Bankruptcy Court, the Court may permit the filing of an amended plan, dismiss the case, or convert the case to Chapter 7.  In a Chapter 7 case, the Debtor's assets would be distributed to the Unsecured Creditors after the payment of all Secured Claims, costs of administration and the payment of priority claims.  Unsecured Creditors would unlikely receive a distribution in a Chapter 7 case.

The cost of distributing the Plan and this Disclosure Statement, as well as the costs, if any, of soliciting acceptances, will be borne by the Debtor.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans under Chapter 11, (b) dismissal of the case, or (c) conversion of the case to a case under Chapter 7 of the Bankruptcy Code.



**Alternative Plans of Reorganization**

If the Plan is not confirmed, any other party in interest in the Reorganization Case could attempt to formulate and propose a different plan or plans. Given the rather mature stage of this case, the Debtor believes that is highly unlikely. The Debtor believes that the Plan will enable Creditors to be paid the maximum amount possible for their Allowed Claims.

WHEREFORE, the Debtors, QSGI, Inc., QSGI-CCSI, Inc. and Qualtech Services Group, Inc. respectfully submit this Combined Liquidation Plan and Disclosure Statement.

Respectfully submitted,

QSGI, INC.
Debtor and Debtor In Possession

Dated: October 8, 2010
    West Palm Beach, Florida

By: _____
    Marc Sherman, CEO

QSGI-CCSI, INC.
Debtor and Debtor In Possession

Dated: October 8, 2010
    West Palm Beach, Florida

By: _____
    Marc Sherman, CEO

Qualtech Services Group, INC.
Debtor and Debtor In Possession

Dated: October 8, 2010
    West Palm Beach, Florida

By: _____
    Marc Sherman, CEO