UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| QSGI, INC., | ) | Case No. 09-23658-BKC-EPK |
| QSGI-CCSI, INC., | ) | Case No. 09-23659-BKC-EPK |
| QUALTECH SERVICES GROUP, INC., | ) | Case No. 09-23660-BKC-EPK |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |

**DEBTORS, QSGI, INC., QSGI-CCSI, INC., AND QUALTECH SERVICES
GROUP, INC.'S THIRD AMENDED DISCLOSURE STATEMENT
IN SUPPORT OF THIRD AMENDED PLAN OF REORGANIZATION**

**DATED FEBRUARY 1, 2011**

Respectfully submitted,

/s/Michael A. Kaufman
**MICHAEL A. KAUFMAN, ESQ.**
**Florida Bar No.: 0628042**
MICHAEL A. KAUFMAN, P.A.
1655 Palm Beach Lakes Boulevard, Suite 1012
West Palm Beach, Florida 33401
Telephone: (561) 478-2878
Facsimile: (561) 584-5555
Email: michael@mkaufmanpa.com
Counsel for the Debtors

## DISCLOSURE STATEMENT

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE DEBTORS' THIRD AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE DATED AS OF FEBRUARY 1, 2011 (AS AMENDED FROM TIME TO TIME, THE "PLAN"), AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED LEGAL ADVICE ON THE TAX LAWS OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS. ANY CREDITOR OR OTHER PARTY BUYING OR SELLING A CLAIM BASED ON THE INFORMATION CONTAINED HEREIN DOES SO AT ITS OWN RISK.

ALL CREDITORS AND HOLDERS OF INTERESTS ARE ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND EXHIBITS CAREFULLY AND COMPLETELY BEFORE DECIDING TO ACCEPT OR REJECT THE PLAN. IF THERE IS A DISCREPANCY BETWEEN THE DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THEN THE PLAN SHALL GOVERN.

THE MANAGEMENT AND INDEPENDENT BOARD OF DIRECTORS OF THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF THE CREDITORS AND EQUITY HOLDERS. IN THE OPINION OF THE DEBTORS, THE TREATMENT OF CLAIMS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS. ACCORDINGLY, THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND EQUITY HOLDERS AND RECOMMENDS THAT CREDITORS AND EQUITY HOLDERS VOTE TO ACCEPT THE PLAN.

THE PLAN PROPOSES EXCULPATION FROM LIABILITY AS TO CERTAIN INDIVIDUALS AND ENTITIES AS SET FORTH IN ARTICLE 10 OF THE PLAN. ALL CREDITORS, HOLDERS OF INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO READ CAREFULLY ARTICLE 10 OF THE PLAN ON EXCULPATION FROM LIABILITY. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, WITH RESPECT TO POST-PETITION ACTIONS, ON THE EFFECTIVE DATE, THE DEBTORS AND ALL PERSONS, INTERESTED PARTIES AND ENTITIES SHALL BE CONCLUSIVELY PRESUMED TO HAVE RELEASED THE FOLLOWING PARTIES (BUT SOLELY TO THE EXTENT SET FORTH BELOW): ALL PROFESSIONALS, KRUSECOM, LLC, AND REORGANIZED DEBTOR (EACH OF THE FOREGOING, A "RELEASED PARTY" AND TOGETHER, THE "RELEASED PARTIES"), FROM ANY CLAIM OR CAUSE OF ACTION BASED ON, ARISING FROM, OR IN ANY WAY CONNECTED WITH, (A) THE CASE (INCLUDING, WITHOUT LIMITATION, ANY ACTIONS TAKEN AND/OR NOT TAKEN WITH RESPECT TO THE ADMINISTRATION OF THE ESTATE OR THE OPERATION OF THE BUSINESS OF THE DEBTORS); (B) THE REORGANIZATION PLAN OR THE DISTRIBUTIONS RECEIVED THEREUNDER; AND (C) THE NEGOTIATION, FORMULATION, AND PREPARATION OF THE REORGANIZATION PLAN, EXCEPT TO THE EXTENT ANY SUCH CLAIM OR CAUSE OF ACTION AGAINST

ANY RELEASED PARTY ARISES SOLELY AS A DIRECT RESULT OF THAT RELEASED PARTY'S FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. NOTWITHSTANDING THE FOREGOING, NOTHING IN THE PLAN OR CONFIRMATION ORDER SHALL RELEASE, DISCHARGE, ENJOIN OR BAR, OR HAVE ANY RES JUDICATA OR PRECLUSIVE EFFECT UPON, ANY CLAIM OR CAUSE OF ACTION AGAINST ANY PERSON OR ENTITY, RELATING TO THE FORMATION OR OPERATION OF KRUSECOM, INCLUDING, WITHOUT LIMITATION, CLAIMS AGAINST CURRENT OR FORMER INSIDERS OF THE DEBTORS FOR BREACH OF FIDUCIARY DUTY OR FOR USURPING CORPORATE OPPORTUNITIES.

THE ENTRY OF THE CONFIRMATION ORDER WILL BE DEEMED TO MEET OR OBVIATE THE NEED FOR ALL NECESSARY SHAREHOLDER APPROVAL OR NOTICE REQUIREMENTS UNDER APPLICABLE LAW NECESSARY TO IMPLEMENT THE REORGANIZATION PLAN OR TO AMEND ITS CORPORATE CHARTER TO MEET THE REQUIREMENTS OF THE REORGANIZATION PLAN.

THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION COMMENTED ON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT.

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR THE ACCOMPANYING DOCUMENTS INCORPORATED BY REFERENCE OR REFERRED TO HEREIN.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND MAY NOT HAVE BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE FINANCIAL PROJECTIONS DESCRIBED IN THE DISCLOSURE STATEMENT HAVE BEEN PREPARED BY KRUSECOM, LLC. THE FINANCIAL PROJECTIONS ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS' AND KRUSECOM, LLC'S MANAGEMENT AND THEIR ADVISORS, MAY NOT ULTIMATELY BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATION OR WARRANTY CAN BE MADE AS TO THE ACCURACY OF THESE PROJECTIONS.

IN THE EVENT THAT ANY IMPAIRED CLASS OF CLAIMS OR INTERESTS VOTES TO REJECT THE PLAN: (1) THE DEBTORS MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN WITH RESPECT TO  CLASS 4

AND 5 UNDER THE BANKRUPTCY CODE'S "CRAMDOWN" PROVISIONS AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO SUCH REQUIREMENTS, OR (2) THE PLAN MAY BE OTHERWISE MODIFIED OR WITHDRAWN.  IF CLASS 4 OR CLASS 5 VOTE AGAINST THE PLAN THE DEBTORS WILL MOST LIKELY NOT BE ABLE TO SATISFY THE CRAMDOWN PROVISIONS OF THE BANKRUPTCY CODE.   IF THE BANKRUPTCY COURT DOES NOT CONFIRM THE PLAN, THE MERGER OF REORGANIZED DEBTOR AND KRUSECOM WILL NOT BE CONSUMMATED AND DEBTORS WILL LIKELY NOT SUBMIT AN ALTERNATIVE REORGANIZATION PLAN, WHICH WOULD RESULT IN THE COMPLETE LIQUIDATION OF THE DEBTORS.

THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS TO ACCEPT THE PLAN AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH IN THE SECTION OF THIS DISCLOSURE STATEMENT TITLED "VOTING ON AND CONFIRMATION OF THE PLAN."

PLEASE REFER TO THE RISK FACTORS OUTLINED ON PAGE 7 THROUGH PAGE 12 OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT A CREDITOR AND/OR EQUITY HOLDER VOTING ON THE PLAN SHOULD CONSIDER.

## DISCLOSURE STATEMENT PURSUANT TO
## SECTION 1125 OF THE BANKRUPTCY CODE

### INTRODUCTION

QSGI, INC. (Case No.: 09-23658), QSGI-CCSI, INC. (Case No.: 09-23659), and QUALTECH SERVICES GROUP, INC. (Case No.: 09-23660 (collectively the "Debtors")[1] have filed with the United States Bankruptcy Court for the Southern District of Florida, West Palm Beach Division (the "Bankruptcy Court"), their Third Amended Plan of Reorganization under Chapter 11 of Title 11, United States Code on February 1, 2011 (as amended from time to time, the "Plan").   This Third Amended Disclosure Statement for Debtors' Third Amended Plan of Reorganization under Chapter 11 of Title 11, United States Code dated as of February 1, 2011 (the "Disclosure Statement"), is submitted pursuant to Section 1125 of the Bankruptcy Code, 11 U.S.C. Section 101, et. seq. (the "Bankruptcy Code"), in connection with the solicitation of votes on the Plan from Holders of Impaired Claims against, and Impaired Interests in the Debtors and the hearing on Confirmation of the Plan scheduled for _____ at the Bankruptcy Court.

The Plan has been approved by the Independent Board of Directors and management of the Debtors.  The Independent Board of Directors of QSGI, Inc. consists of Benee Scola, William J. Barbera, and David K. Waldman. In the opinion of the Debtors, as described below, the treatment of claims under the Plan contemplates a greater recovery than that which is likely to be achieved under other alternatives for the reorganization or liquidation of the Debtors.   Accordingly, the Debtors' Independent Board of Directors believes that confirmation of the Plan is in the best interests of creditors and recommends that creditors and equity holders vote to accept the Plan.

---

[1] Since the filing of their petitions for relief under Chapter 11, the Debtors made application to and were approved by the Court to be jointly administered under the lead case of QSGI, Inc., having Case No.: 09-23658.  In the Plan, the Debtors seek Bankruptcy Court authorization to substantively consolidate their bankruptcy estates.

Accompanying this Disclosure Statement are copies of the following:

(a) The Debtors' Third Amended Plan of Reorganization (the "Plan") dated February 1, 2011, attached hereto as Exhibit A;

(b) In the case of Impaired Classes of Claims and Equity Interests (collectively, the "Voting Classes"), a ballot for acceptance or rejection of the Plan attached hereto as Exhibit B; and

(c) Financial Projections and Liquidation Analysis attached hereto as Exhibit C.

(d) KruseCom balance sheet assuming conversion of outstanding notes attached hereto as Exhibit D.

(e) Victory Park Capital and Debtors' Settlement Document attached hereto as Exhibit E.

(f) John Riconda and Debtors' Settlement Document attached hereto as Exhibit F.

## PURPOSE OF THIS DISCLOSURE STATEMENT

The Debtors filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the Bankruptcy Court on July 2, 2009 (the "Petition Date"). The Plan is being simultaneously filed with the Disclosure Statement. The Debtors may file further amendments to the Plan from time to time. The following introduction and summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements appearing elsewhere in this Disclosure Statement and the Plan. All capitalized terms not defined in this Disclosure Statement have the meanings given to them in the Plan.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek Chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, and the anticipated reorganization of the Debtors. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and how solicitation and voting on the Plan will occur. Certain provisions of the Plan, and thus the descriptions and summaries contained in this Disclosure Statement may be: (a) the subject of continuing negotiations among the Debtors and various parties; (b) may not have been finally agreed on; and/or (c) may be modified. Those modifications, however, will not have a material effect on the distributions contemplated by the Plan.

The Debtors and KruseCom are the proponents of the Plan within the meaning of Bankruptcy Code §1129. The Plan contains separate Classes and proposes recoveries for Holders of Claims and Equity Interests in the Debtors. After careful review of the Debtors' current business operations, estimated recoveries in a liquidation scenario, and the prospects of ongoing business, the Debtors have concluded that the recovery to Creditors will be maximized by the reorganization of the Debtors as contemplated by the Plan. Under the Plan, the Reorganized Debtor, QSGI, Inc., will be the disbursing agent of the $50,000 to be paid pro rata to Allowed Claims of the unsecured creditors, to be paid 180 days after Confirmation, or sooner if practicable. American Stock Transfer & Trust Company will be the disbursing agent for the stock to Lawful Holders of the Reorganized Debtor pursuant to the Plan.

Specifically, the Debtors believe that continued operations after confirmation of the Plan provides Creditors and Holders of Equity Interests with the maximum possible recovery under the circumstances.

**VOTING INSTRUCTIONS**

**Who May Vote**

Only the Holders of Claims and Equity Interests which are deemed "Allowed" under the Bankruptcy Code and which are "Impaired" under the terms and provisions of the Plan are permitted to vote to accept or reject the Plan. For purposes of the Plan, only the Holders of Allowed Claims and Allowed Equity Interests in the Voting Classes are Impaired under the Plan and thus may vote to accept or reject the Plan. A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO MEMBERS OF THE VOTING CLASSES. **A BALLOT WILL BE PROVIDED UPON APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.**

**Notice to Holders of Claims and Equity Interests**

This Disclosure Statement is being used to solicit votes on the Plan only from Holders of Impaired Claims and Equity Holders, and is being transmitted to Creditors with Unimpaired Claims who are not entitled to vote and other parties in interest for informational purposes only.

This Disclosure Statement and the other materials included in the solicitation package are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes on the Plan. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors or the Plan other than the information contained in this Disclosure Statement.

Certain of the information contained in this Disclosure Statement is by its nature forward-looking and contains estimates, assumptions and projections that may be materially different from actual or future results. Except as otherwise specifically stated, this Disclosure Statement does not reflect any events that may occur after the date of this Disclosure Statement and that may have a material impact on the information contained in this Disclosure Statement. The Debtors and/or the Reorganized Debtor reserve the right to amend and/or supplement this Disclosure Statement as needed from time to time.

Except where specifically noted, the financial information contained in this Disclosure Statement has not been audited by a certified public accountant and may not have been prepared in accordance with generally accepted accounting principles.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances of the Plan and may not be relied on for any purpose other than to determine how to vote on the Plan. No person may give any information or make any representations, other than the information and representations contained in this Disclosure Statement, regarding the Plan.

This Disclosure Statement has been prepared in accordance and compliance with Bankruptcy Code §1125 and Bankruptcy Rule 3016(b) and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law. This Disclosure Statement has not been approved nor disapproved by the Securities and Exchange Commission (the "SEC") or any state securities commission, nor has the SEC commented on the accuracy or adequacy of the statements contained in this Disclosure Statement.

This Disclosure Statement may not be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan on holders of Claims against, or Equity Interests in, the Debtor.

**How to Vote**

Each Holder of a Claim or Equity Interest in a Voting Class should read the Disclosure Statement, together with the Plan and any exhibits hereto, in their entirety. After carefully reviewing the Plan and this Disclosure Statement and its exhibits, please complete the enclosed Ballot, including your vote with respect to the Plan, and return it as provided below. If you have an Impaired Claim in more than one Class, you should receive a separate Ballot for each such Claim. If you receive more than one Ballot you should assume that each Ballot is for a separate Impaired Claim and you should complete and return all of them.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures please call Michael A. Kaufman, Esq. at (561) 478-2878.

YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND RETURN IT TO THE ADDRESS FOR THE BANKRUPTCY COURT PROVIDED BELOW. IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND **RECEIVED** BY THE CLERK OF THE BANKRUPTCY COURT BY NO LATER THAN SEVEN (7) DAYS BEFORE THE DATE OF THE CONFIRMATION HEARING.

**All Ballots should be returned either by regular mail, hand delivery or overnight delivery to and received by the Clerk of the Bankruptcy Court by no later than seven (7) days before the date of the Confirmation Hearing:**

Office of the Clerk of the Bankruptcy Court
United States Bankruptcy Court for the Southern District of Florida
1515 N. Flagler Drive
West Palm Beach, Florida 33401

With a copy to:

Michael A. Kaufman, Esq.
Michael A. Kaufman P.A.
1655 Palm Beach Lakes Boulevard, Suite 1012
West Palm Beach, Florida 33401

**Confirmation Hearing and Objections to Confirmation**

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for_____ (the "Confirmation Hearing"), at the United States Bankruptcy Court, 1515 N. Flagler Drive, West Palm Beach, Florida 33401, which may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any interested parties that elect to object to the Confirmation of the Plan must object by_____, 2011, i.e., 14 days before the Confirmation Hearing, and such objection must be filed with the court on the foregoing date, and served pursuant to the Bankruptcy Rules and Local Rules of the Bankruptcy Court.

**Acceptance of Plan and Vote Required for Class Acceptance**

As the Holder of an Allowed Claim or an Allowed Equity Interest in the Voting Classes, your vote on the Plan is extremely important.  In order for the Plan to be accepted and thereafter confirmed by the Bankruptcy Court without resorting to the "cramdown" provisions of the Bankruptcy Code, votes representing at least two-thirds in amount and more than one-half in number of the Allowed Claims of each Impaired Class  must be cast for the acceptance of the Plan.  The Debtors are soliciting acceptances only from Holders of Claims in Classes 4, 5 and 6, which are the only Classes Impaired and, therefore, entitled to vote on the Plan.  You may be contacted by the Debtors or their agents with regard to your vote on the Plan.

To meet the requirement for confirmation of the Plan under the "cramdown" provisions of the Bankruptcy Code with respect to any Impaired Class of Claims or Equity Interests which votes to reject, or is deemed to vote to reject, the Plan (a "Rejecting Class"), the Debtors would have to show that all Classes junior to the Class rejecting the Plan will not receive or retain any property under the Plan unless all Holders of Claims or Equity Interests in the Rejecting Class receive or retain under the Plan property having a value equal to the full amount of their Allowed Claims or Allowed Equity Interests in this case.  For a more complete description of the implementation of the "cramdown" provisions of the Bankruptcy Code pursuant to the Plan, see "VOTING ON AND CONFIRMATION OF THE PLAN – Confirmation Without Acceptance by All Impaired Classes."  In the event that the Debtors must comply with the cramdown requirements of the Bankruptcy Code and are not able to meet the provisions of Section 1129(a), then the Plan that has been presented most likely would not be confirmed pursuant to bankruptcy law.  If Class 4 or Class 5 vote against the Plan the Debtors will most likely not be able to satisfy the cramdown provisions of the Bankruptcy Code.  If the Bankruptcy Court does not confirm the Plan, the merger of Reorganized Debtor and KruseCom will not be consummated and Debtors will likely not submit an alternative reorganization plan, which would result in the complete liquidation of the Debtors.

<u>**RISK FACTORS**</u>

<u>FORWARD-LOOKING STATEMENTS AND ASSOCIATED RISK</u>

Certain statements in the proposed Plan constitute "forward-looking statements".  All such forward-looking information involves risks and uncertainties and may be affected by many factors, some of which are beyond Debtors, Reorganized Debtor and Krusecom's control.  These factors include:

- Their growth strategies.
- Anticipated trends in their business and demographics.
- Regulatory, competitive or other economic influences.

Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by such forward-looking statements.  The words "believe," "expect," "anticipate," "intend," and "plan" and similar expressions identify forward-looking statements.  Readers are cautioned not to place undue reliance on these forward-looking statements, which speak only as of the date the statement was made.

Factors Affecting Future Operating Results

You should carefully consider the following risk factors, together with all other information contained or incorporated by reference in this Disclosure Statement before you decide to vote to accept the Plan. These factors could cause the Reorganized Debtor's and Krusecom's future results to differ materially from those expressed in or implied by forward-looking statements made by Debtors, Reorganized Debtor and Krusecom. Additional risks and uncertainties not presently known to us or that we currently deem immaterial may also harm our business.

Uncertainty Of Future Financial Results

Our future financial results are uncertain. There can be no assurance that the Reorganized Debtor and/or Krusecom will be profitable, and we may incur losses in the foreseeable future. Achieving and sustaining profitability depends upon many factors, including Reorganized Debtor's and/or Krusecom's ability to raise capital when needed, the success of Debtors, Reorganized Debtor and/or Krusecom's various marketing programs, and the maintenance or reduction of expense levels.

Fluctuations In Future Quarterly Results

Debtors, Reorganized Debtor and Krusecom's quarterly operating results may fluctuate based on how well the Debtors, Reorganized Debtor and/or Krusecom manage their businesses. Some of the factors that may affect how well the Debtors, Reorganized Debtor and/or Krusecom manage their businesses include the timing of delivery of significant orders; ability to engineer customer solutions in a timely, cost effective manner; ability to structure Debtors, Reorganized Debtor and/or Krusecom's organization to enable achievement of operating objectives; the ability to meet the needs of customers and markets; the ability to deliver, in a timely fashion, products for which orders have been received; the length of the sales cycle; the demand for products and services offered; the introduction or announcements by computer manufacturers relating to the remarketing of new and used equipment; the hiring and training of additional personnel; as well as general business conditions. If Debtors, Reorganized Debtor and/or Krusecom fail to effectively manage their business, this could adversely affect results of operations.

Industry cycles may strain our management and resources

Cycles of growth and contraction in our industry may strain Debtors', Reorganized Debtor's, and/or Krusecom's management and resources. To manage these industry cycles effectively, we must: improve operational and financial systems; train and manage our employee base; successfully integrate operations and employees of businesses we acquire or have acquired; attract, develop, motivate and retain qualified personnel with relevant experience; and adjust spending levels according to prevailing market conditions. If we cannot manage industry cycles effectively, our business could be seriously harmed.

We Have Limited Principal Markets And Customers; We Have Significant Dependence On Major Customers; There Is A Risk Of Industry Concentration

Krusecom currently operates, and the Reorganized Debtor will operate, solely in the United States. As a result of this concentration of our customers, our results of operations could be negatively affected if any of the following occurs: one or more of customers becomes insolvent or goes out of business; one or more key customers significantly reduces, delays or cancels orders; or one or more significant customers selects products or services from one of our competitors.

Although Debtors, Reorganized Debtor and Krusecom are striving to broaden their market focus to include sales to other markets, both nationally and internationally, in the immediate future we expect that we will continue to derive a substantial percentage of our sales of product in the United States. Accordingly, unfavorable economic conditions or factors that relate to these industries, particularly any such conditions that might result in reductions in capital expenditures could have a material adverse effect on our results of operations.

<u>If Debtors, Reorganized Debtor and/or Krusecom Need Additional Financing For Unanticipated Working Capital Needs Or To Finance Acquisitions, We May Not Be Able To Obtain Such Capital, Which Could Adversely Affect Our Ability To Achieve Our Business Objectives.</u>

Debtors, Krusecom and Reorganized Debtor's growth depends upon market growth and our ability to enhance our existing products and services, and to introduce new products and services on a timely basis. One of the ways to accomplish this is through acquisitions. Acquisitions involve numerous risks, including, but not limited to, the following:

•        difficulty and increased costs in assimilating employees, including our possible inability to keep and retain key employees of the acquired business;
•        disruption of our ongoing business;
•        discovery of undisclosed liabilities of the acquired companies and legal disputes with founders or shareholders of acquired companies;
•        inability to successfully incorporate acquired technology and operations into our business and maintain uniform standards, controls, policies, and procedures;
•        inability to commercialize acquired technology;
•        the need to take impairment charges or write-downs with respect to acquired assets and
•        the failure of the acquired entity to perform as anticipated.

No assurance can be given that our prior acquisitions or our future acquisitions, if any, will be successful or provide the anticipated benefits, or that they will not adversely affect our business, operating results or financial condition.

<u>The Industry In Which We Compete Is Highly Competitive</u>

We face competition in each area of our business. Some of our competitors have greater resources and a more established market position than we have. Some competitors have longer operating histories, larger customer or user bases, greater brand name recognition and significantly greater financial, marketing and other resources than we do. Some of these competitors already have an established brand name and can devote substantially more resources to increasing brand name recognition and product acquisition than we can.

<u>No Dividends On Common Stock; Issuance of Preferred Stock; Reverse Stock Split; Dilution of Ownership Interests</u>

There can be no assurance that dividends will be paid in the foreseeable future. Debtors, Krusecom and Reorganized Debtor intend to use any earnings that may be generated to finance the growth of our businesses. QSGI, Inc. prior to bankruptcy had issued preferred stock and in the event that the Reorganized Debtor issues preferred stock in the future it may have an adverse impact on the Reorganized Debtor's earnings to common stock. If the Plan becomes effective the Reorganized Debtor will have a large outstanding share count of common stock in relation to the size of the entity.

The Reorganized Debtor intends, at some unknown time in the future, to reduce the total outstanding share count of common stock by performing a reverse stock split. Although, the timing and ratio of the reverse stock split is unknown. This split may have an adverse impact on the Reorganized Debtor's overall market value. The Plan authorizes the Reorganized Debtor to issue up to 2 billion shares of common stock. The issuance of such common stock will have a dilutive effect on common stock ownership interests.

Possible Resale of Common Stock

To the extent persons that receive Reorganized Debtor common stock pursuant to Section 1145 are deemed to be "underwriters" (collectively, the "Restricted Holders"), resale of such securities by Restricted Holders would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, Restricted Holders may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 provides that if certain conditions are met (e.g., the availability of current public information with respect to the issuer, volume limitations, and notice and manner of sale requirements), specified persons who resell restricted securities or who resell securities which are not restricted but who are "affiliates" of the issuer of the securities sought to be resold will not be deemed to be "underwriters" as defined in Section 2(a)(11) of the Securities Act. Rule 144 may not be available if there is no public financial information available for the Reorganized Debtor.

Certificates evidencing shares of common stock pursuant to Section 1145 received by Restricted Holders will bear a legend substantially in the form below:

"THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT COVERING SUCH SECURITIES OR THE SECURITIES ARE SOLD IN A TRANSACTION THAT IS EXEMPT FROM OR NOT SUBJECT TO THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT".

Any holder of a certificate bearing such legend may present such certificate to the transfer agent for exchange for one or more certificates not bearing such legend or for transfer to a new holder without such legend at such times as (a) such shares are sold pursuant to an effective registration statement under the Securities Act or (b) or such holder delivers to the Reorganized Debtor an opinion of counsel reasonably satisfactory to Reorganized Debtor to the effect that such shares are no longer subject to the restrictions applicable to "underwriters" under Section 1145 of the Bankruptcy Code or (c) such holder delivers to Reorganized Debtor an opinion of counsel reasonably satisfactory to Reorganized Debtor to the effect that such shares are no longer subject to the restrictions pursuant to an exemption under the Securities Act and such shares may be sold without registration under the Securities Act.

Whether a particular person would be deemed to be an "underwriter" of securities to be issued pursuant to the Plan or an affiliate of the Reorganized Debtor would depend on various facts and circumstances applicable to that person. Neither the Debtors nor the Reorganized Debtor express any view as to whether such person would be such an 'underwriter' or an "affiliate" in view of the complex and subjective nature of the question. The Debtors and the Reorganized Debtor make no representations concerning the right of any person to trade in securities of the Reorganized Debtor. Accordingly, it is recommended that potential recipients of any securities to be issued pursuant to the Plan consult their own counsel concerning whether they may freely trade such securities.

Dependence On Key Individuals

Debtors, Reorganized Debtor and/or Krusecom's success depend to a significant extent upon the continued contributions of key management, technical and sales personnel, many of whom would be difficult to replace. The loss of one or more of these employees could harm our business. Our success also depends on our ability to identify, attract and retain qualified technical, sales, marketing, finance and managerial personnel. Competition for qualified personnel is particularly intense in our industry and in our locations. This makes it difficult to retain our key personnel and to recruit highly qualified personnel. We have experienced, and may continue to experience, difficulty in hiring and retaining candidates with appropriate qualifications. To be successful, we need to hire candidates with appropriate qualifications and retain our key executives and employees.

Debtors and Reorganized Debtor are organized with a small senior management team. If we were to lose the services of one of the following members of our management team, our overall operations could be adversely affected. We consider our key individuals as of the date of this Plan to be:

Marc Sherman CEO and David Meynarez CFO

QSGI, Inc. May Not Be Able To Execute The Merger Transaction With Krusecom LLC

KruseCom, LLC ("KruseCom") is a Florida limited liability company founded by present and former insiders of the Debtors. After confirmation of the Plan, QSGI, Inc. shall be referred to as the Reorganized Debtor. Marc Sherman is a managing member and co-founder of KruseCom, and also CEO and Chairman of the Board of QSGI, Inc. Mr. Sherman has been a necessary individual in the bankruptcy process for the Debtors. David Meynarez is a managing member, co-founder, and employee of KruseCom, and CFO and Board Member of QSGI, Inc. Mr. Meynarez has been a necessary individual in the bankruptcy process for the Debtors. Carl Saracino is a co-founder and employee of KruseCom. Mr. Saracino was a former director of QSGI, Inc. The purpose of the restructuring plan is to create a marketable entity that shall merge with KruseCom on the Effective Date. The Effective Date shall be the date on which the Confirmation Order becomes final and nonappealable, that is, 15 days following Confirmation of the Plan. Parties receiving shares of Reorganized Debtor on the Effective Date should be aware that there is a risk to parties approving the Plan that the Reorganized Debtor and KruseCom may not be able to execute a merger transaction. In the event a merger does not take place the Plan will not become effective and no shares will be issued under the Plan. As a result of the merger not taking place, the cases may be converted to cases under chapter 7 of the Bankruptcy Code, be dismissed, or the Debtors may present another Plan. However, Debtors and Reorganized Debtor's management reasonably believes that it will be able to execute a merger transaction with KruseCom upon confirmation of the Plan and that it has the reasonable assurance of KruseCom management that KruseCom is committed to proceeding with the merger after the confirmation of the Plan.

QSGI, Inc. Is Delinquent In Its SEC Reporting Obligations

QSGI, Inc. has not filed its periodic reports with the Securities and Exchange Commission since March 31, 2009, and is therefore delinquent in its reporting obligations. As a result of the delinquency, QSGI, Inc. could face enforcement action from the Securities and Exchange Commission and will not be able to be a listed company on a stock exchange or on the Bulletin Board until the delinquent reports

are filed and meet the review standards of the Securities and Exchange Commission. As a result, in addition to the risk factors stated in the above provision on "Possible Resale of Common Stock", Reorganized Debtor's stock may not have an active trading market and holders of Reorganized Debtor's stock may not be able to liquidate Reorganized Debtor's stock. In the event the Plan is approved and Reorganized Debtor and KruseCom are able to consummate the merger transaction, the Reorganized Debtor plans to be current with all delinquent SEC periodic reports.

<u>Former and Current Insiders Of QSGI, Inc. May Benefit From The Merger With KruseCom</u>

Some of the current and former insiders of QSGI, Inc., including Marc Sherman and David Meynarez, helped found and manage KruseCom and therefore may receive a potential benefit if the Plan is approved. After the consummation of the merger with KruseCom, former insiders of QSGI, Inc. and others at KruseCom will own more than, directly or indirectly, 190,000,000 shares of the stock in the Reorganized Debtor as a result of their ownership of KruseCom and other holdings. Approval of the merger with KruseCom will result in significant dilution of the ownership interests of current QSGI, Inc. shareholders and any exchanged interests of QSGI, Inc. creditors. The Debtors have not conducted an independent investigation with respect to insiders usurping corporate opportunities by forming KruseCom, but any such claims are preserved in the Plan. If such a claim is successful by interested parties this could increase the distribution to creditors and equity holders in this case. Management of QSGI, Inc. is not aware of any corporate opportunities being usurped.

<u>Approval Of The Plan May Not Provide Any Economic Value To QSGI, Inc.'s Creditors And Stockholders</u>

The economic success or failure of the Plan as it applies to the creditors and stockholders of QSGI, Inc. is uncertain and may not result in the creditors and stockholders of QSGI, Inc. obtaining any return on their claims. Further, consummation of the merger transaction may prevent creditors and stockholders of QSGI, Inc. from realizing a loss on their QSGI, Inc. claim or their investment in QSGI, Inc. for tax purposes for an undetermined amount of time in the future.

<u>Reorganized Debtor may not be able to raise additional capital</u>

Reorganized Debtor may not be able to raise additional capital and therefore may not be able to execute its business strategy. As a result, creditors and stockholders of QSGI, Inc. may find that they own the stock of Reorganized Debtor which is unable to grow or become and maintain profitability.

<u>There Is No Assurance That A Market For The Common Stock Of Reorganized Debtor Will Develop</u>

There is no assurance that a market for the common stock of Reorganized Debtor will develop after approval of the Plan and therefore holders of Reorganized Debtor common stock will likely incur periods of illiquidity and should plan on holding their shares of Reorganized Debtor common stock for an extended period of time. Further, even if a stockholder is able to sell their shares of Reorganized Debtor's common stock, there is no assurance that they will be able to obtain a fair price for their shares or that such price will fairly reflect the underlying value of Reorganized Debtor.

The Bankruptcy Court May Not Confirm The Plan

The Bankruptcy Court may not confirm the Plan if that Court determines that the primary purpose of the Plan is the avoidance of the registration provisions of the Federal Securities laws. Further, in the event that the Debtors must comply with the cramdown requirements of the Bankruptcy Code and are not able to meet the provisions of Section 1129(b), then the Plan that has been presented most likely would not be confirmed pursuant to bankruptcy law. If Class 4 or Class 5 vote against the Plan the Debtors will most likely not be able to satisfy the cramdown provisions of the Bankruptcy Code. If the Bankruptcy Court does not confirm the Plan, the merger of Reorganized Debtor and KruseCom will not be consummated and Debtors will likely not submit an alternative reorganization plan, which would result in the complete liquidation of the Debtors.

The Court May Not Grant Debtors' Request For Substantive Consolidation of The Debtors' Cases

In the Plan, Debtors seek Bankruptcy Court authorization to substantively consolidate their bankruptcy estates. They believe that the benefits of substantive consolidation far outweigh the detriment to any creditors of individual Debtors. However, substantive consolidation is an extraordinary remedy and the Bankruptcy Court may find that that the circumstances do not warrant such relief. In such an event, the Debtors reserve the right to amend the Plan.

Members of KruseCom Will Have The Ability To Control The Reorganized Debtor

The members of KruseCom will own approximately, directly or indirectly, more than 190,000,000 shares of the stock in the Reorganized Debtor and will have the ability to control the activities of Reorganized Debtor without the consent or approval of the creditors and stockholders of the Debtors. In addition to ownership in KruseCom, Marc Sherman also owns approximately 800,000 shares of QSGI, Inc. and has approximately 1,000,000 options in QSGI, Inc. No one at KruseCom owns more than 5% of the outstanding shares of QSGI, Inc.

Certain Creditors And Shareholders Of Debtors May Not Be Able To Trade Their Stock In The Reorganized Debtor Until A Registration Statement Is Filed With The SEC

Certain creditors and shareholders of the Debtors that may be deemed to be affiliates of one or more of the Debtors may not be able to trade their stock in the Reorganized Debtor until a conforming registration statement is filed with the SEC. There can be no assurance that the Reorganized Debtor will attempt to file or will be able to satisfy the SEC requirements to file a conforming registration statement quickly after the confirmation of the Plan or at any time thereafter. Parties that receive shares for administrative claims may be deemed underwriters depending on the specific facts and circumstances of the relationship of the party to the Debtor(s).

## HISTORY AND BUSINESS OF THE
## DEBTORS PRIOR TO THE CHAPTER 11 FILING;
## EVENTS LEADING TO THE CHAPTER 11 FILING

The Debtors are QSGI, Inc., QSGI-CCSI, Inc. and Qualtech Services Group, Inc. (collectively, the "Debtors"). QSGI, Inc. ("QSGI"), QSGI-CCSI, Inc. ("QSGI-CCSI"), and Qualtech Services Group, Inc. ("Qualtech") are all Delaware corporations.

The Debtors operated as a technology services provider, offering a full suite life-cycle for their corporate and government clients' entire information technology platform. The Debtors serviced three separate business segments: Data Center Maintenance Services; Data Security and Compliance; and Network Infrastructure Design and Support. The Data Center Maintenance Services segment provided hardware maintenance services for enterprise-class hardware and associated peripheral products and data center consulting to companies throughout the United States. It supported its clients' IT hardware needs through the sale of refurbished enterprise-class hardware, including mainframe and midrange processors and associate peripheral products and replacement parts. The Data Security and Compliance segment offered data security and regulatory compliance services for end-of-life business computing Information Technology assets. It provided solutions to companies whose business computing technologies have come to the end of their life cycle. The Network Infrastructure Design and Support segment provided service for a full spectrum of technologies from mainframes to PCs, including network infrastructure, managed services, IP security, IP telephony and storage solutions. The company provided its corporate, government and educational clients with these services, which included design, implementation, and monthly maintenance services on corporations' network hardware and related infrastructure, as well as round the clock monitoring and diagnostics through its North American network operating center. Its hardware maintenance offerings included repair/replacement of desktops, printers, and LAN components; and full service LAN/WAN design and support services.

QSGI was a vibrant and growing organization that commenced operations as Windsor Tech in 2001. The company later merged with Delta States Oil and became a public company in 2003. From its inception, the company grew primarily organically until its first major acquisition of a mainframe hardware reseller in May 2004, Qualtech. The acquisition of Qualtech, which cost $10 million, was used as a platform to further penetrate the reselling of mainframe (Z- Series) lower margin hardware with an eye on the higher margin around the clock maintenance services. The company was successful in implementing its business plan and grew 28% in 2006. However, in the early part of fiscal year 2007, IBM disallowed "feature changes" or upgrades and downgrades on used mainframe computer equipment. This crippled the mainframe hardware reselling business, reduced sales by $9 million, caused a $7.2 million write off on the Qualtech acquisition, significantly degraded the value of the company's inventory, placed the company in violation of its loan covenants, which resulted in higher interest charges and forced the company to look for a new lender, and reduced the company's market value by $25 million over the next 12 month period.

During the following 18 month period, QSGI searched for another acquisition target to replace the revenue and profit void. QSGI believed it located such a target and acquired CCSI in 2008. The acquisition was financed through a $10M seller's note which required periodic interest payments at a rate of 10% and a three year balloon payment in year three and gave the seller a secured interest in the stock of CCSI. Furthermore, the seller, John Riconda, was retained to run and grow the business as its divisional president reporting directly to the CEO. Additionally, CCSI was operating out of a facility that was owned by the seller. This left the seller with a secured interest in the stock of CCSI, the landlord to CCSI and an employee of QSGI. QSGI started but never completed a full operational and system integration of the CCSI. Thus, CCSI was running on legacy financial systems under full control of the seller and reporting information on a periodic basis for SEC reporting to QSGI, which was then consolidated into financial reports.

Unfortunately, the acquisition of CCSI took place just as the general economic conditions of the country started to deteriorate and QSGI was never able to fully realize the benefits of the acquisition. The waning financial performance left QSGI unable to make payments on the seller's note. On June 4, 2009, QSGI received notification from Mr. John Riconda that there was an Event of Default under the Subordinated Secured Convertible Note between QSGI-CCSI, Inc. and QSGI INC., on the one hand,

and Mr. Riconda, on the other. As such, Mr. Riconda instructed the Escrow Agent to deliver all of the Pledged Collateral held by the Escrow Agent pursuant to the Pledge Agreement, as the term Pledged Collateral is defined in paragraphs 1, 1.1 and 1.2 of the Pledge Agreement. As expressly set forth in the Pledge Agreement, the Pledged Collateral that the Escrow Agent should deliver to Mr. Riconda included, but was not limited to, the Pledged Shares, which constituted 100% of the capital stock of Contemporary Computer Services, Inc. ("CCSI"). The Event of Default consisted of Pledgors' failure to make required interest payments pursuant to the Note within ten (10) days of the dates on which such interest payments became due and payable. After this event, Mr. Riconda barred QSGI from physical access to the CCSI operation and CCSI stopped producing financial reports to QSGI, which were an integral part of QSGI's consolidated performance reported to the SEC.

The culmination of these events left the company in an untenable financial condition midway through 2009 with shrinking revenue, margins and working capital, unfavorable borrowing rates and over $23 million in obligations. On July 2, 2009, QSGI, along with QSGI-CCSI and Qualtech, each filed voluntary petitions under chapter 11 of the Bankruptcy Code in the Southern District of Florida. Upon application to the Bankruptcy Court, the Chapter 11 cases of QSGI, QSGI-CCSI and Qualtech, are being jointly administered under the case of QSGI having Case No.: 09-23658.

The following is a summary of the Debtors' financial performance since 2003. All numbers in the chart are in (000's):

|  | Annual 2003 | Annual 2004 | Annual 2005 | Annual 2006 | Annual 2007 | Annual 2008 | Q1 2009 |
|---|---|---|---|---|---|---|---|
| Revenue | 7,484 | 22,080 | 36,386 | 46,409 | 37,221 | 34,151 | 7,196 |
| Cost of Sales | 5,492 | 16,651 | 28,886 | 36,549 | 28,043 | 26,671 | 5,933 |
| Gross Profit | 1,992 | 5,428 | 7,500 | 9,860 | 9,178 | 7,480 | 1,263 |
| SG&A | 1,988 | 4,836 | 8,732 | 9,664 | 9,905 | 10,983 | 2,758 |
| Interest Expense | 80 | 83 | 160 | 239 | 396 | 1,432 | 880 |
| Goodwill Charge-off |  |  |  |  | 7,207 |  |  |
| Depreciation and amortization | 72 | 392 | 634 | 685 | 702 | 728 | 217 |
| Net Income | (147) | 118 | (2,026) | (728) | (9,032) | (5,663) | (2,592) |

QSGI has 30,922,716[2] shares of common stock outstanding, 5,000,000 shares of preferred stock authorized, and approximately $4.3 million dollars of redeemable convertible preferred stock outstanding. QSGI has approximately 1,790 stockholders holding common stock. The stock is traded on the OTCBB as QSGIQ[3] and has had a 52 week range of $0.0001 to $0.30 per share. QSGI is not in compliance with SEC reporting requirements and has not filed the required periodic reports such as 10K's and 10Q's since the filing of the bankruptcy petition. Specifically, QSGI's last 10 level financial filing occurred in the first quarter of 2009. Thus the company needs to file five (5) 10Q's and two (2) 10K's to bring its filings current to fiscal year end 2010. The company is projecting this cost to be approximately $125,000 for annual audits, quarterly reviews, financial statement preparation, legal review and other accounting services. Additionally, the company has retained Morison Cogen to review and audit the financial statements supporting these delinquent filings. The company is currently doing an analysis on preferential payments as well as unauthorized post-petition payments. If the company is successful in pursuing these claims, it will use the proceeds to assist in this effort. Further, KruseCom has offered to provide DIP financing, if needed, to ease the timing differential of the

---

[2] This figure has been adjusted by the VPC and Riconda stock being returned to the corporate treasury.

[3] Pre-bankruptcy filing the stock symbol was QSGI, and post-bankruptcy filing the stock symbol changed to QSGIQ.

anticipated cash flow in an amount up to $100,000. Terms and condition of the foregoing DIP loan have not been negotiated. In the event of a DIP loan, the Debtors will seek the appropriate approval from the Bankruptcy Court. The Debtors plan to file the necessary periodic reports to regain compliance with the reporting requirements of the SEC by the Effective Date.

**Principals and Management**

As stated above, QSGI is a publicly traded entity with approximately 1790 shareholders. QSGI-CCSI and Qualtech are wholly owned subsidiaries of QSGI. Prior to the Petition Date, the Debtors were managed by a Board of Directors consisting of Marc Sherman, as Chairman, Robert W. VanHellemont, and Geoffrey A. Smith. Directors were authorized to receive $2,500 per month in compensation. However, due to cash flow issues, compensation was only paid sporadically to the Directors. Subsequent to the Petition Date, all of the directors of the Debtors resigned with the exception of Marc Sherman, and on August 11, 2010, the following individuals were added to the Board of Directors: (i) Benee Scola, (ii) William J. Barbera, (iii) David J. Meynarez, and (iv) David K. Waldman. The current Directors are each receiving options for 250,000 shares of stock in pre-reorganization QSGI, which options vest ratably over 3 years in lieu of payment of cash compensation. The strike price for the foregoing options is $0.01. If the company is able to reorganize under the Chapter 11 case and begins to operate at a profit, the board may reinstate its former policy where board members were compensated with both cash and stock.

**Background of Board of Directors**

Marc Sherman founded QSGI in August 2001 and has served as Chairman and Chief Executive Officer since then. Mr. Sherman previously served as a director and Chief Executive Officer of Intellesale, Inc. (and its predecessor, Universal Commodities Corp.) from December 1994 to July 2001. Intellesale, Inc., was a company that purchased and sold large volumes of off-lease/off finance excess, used, refurbished and "as-is" computer equipment and related products, and provided technology asset management to companies wishing to maximize the value of their computer equipment coming to the end of its useful or book lives. Prior to 1994, Mr. Sherman served in key positions in various family businesses. Mr. Sherman has over fifteen years of experience in marketing, operations and executive management.

Ms. Benee Scola is the president and founder of Benee Scola and Company, realtors in Harvey Cedars, Long Beach Island, New Jersey. Her company was established in 1995 and is a consistent leader in the market it serves, representing high net worth individuals. Since 1987, she has been a top producing real estate broker in Long Beach Island, New Jersey and is a successful real estate investor. She was a Board of Trustee member in 2007 and 2008 for the non-profit Long Beach Island Foundation for the Arts and Sciences in Loveladies, New Jersey. She headed the Foundation's marketing and membership committees and was elected to serve as an executive board member. She also was elected and served on the Borough Council of Surf City, New Jersey. There is no family relationship between Ms. Scola and any other officer or director of the Company and her company is not a parent, subsidiary, or other affiliate of the Company.

Mr. William J. Barbera is a CPA licensed in Pennsylvania and founder of the firm, Barbera & Associates, PC. He has been in public practice for 20 years. He is a graduate of St. Joseph's University in Philadelphia, Pennsylvania and was a Board member of Access Services, a $24 million non-profit organization helping the mentally and physically handicapped for 6 years and was a member of their Audit committee. He has a diversified career in both corporate management and public practice. He enjoys helping small business entrepreneurs with their start-up phase and then providing the business council that helps them grow their businesses. His clients range from start-up to $20 million in sales. In

addition to accounting services, he specializes in tax strategies, planning and preparation. His clients include manufacturers, service providers, medical & dental practices, professional athletes and many other corporate and personal clients. There is no family relationship between Mr. Barbera and any other officer or director of the Company and his company is not a parent, subsidiary, or other affiliate of the Company.

Mr. David J. Meynarez is a CPA licensed in Florida and has served as Chief Financial Officer of KruseCom since 2009. Over the past 15 years, he has held a variety of accounting, financial and operational positions in both large multi-billion dollar publicly traded companies as well as small entrepreneurial startups, has participated in numerous M&A transactions from due diligence to integration and capital expansion projects for capacity increases and cost mitigation, has worked with and helped implement large ERP and small accounting packages, and has worked at companies in technology, heavy building materials and energy industries. He started his career in public accounting at Deloitte and Touche and earned both a bachelor's and master's degree in accounting from the Florida Atlantic University. There is no family relationship between Mr. Meynarez and any other officer or director of the Company.

Mr. David K. Waldman is the president and founder of Crescendo Communications, LLC, a leading New York City based investor relations firm. He has a long and successful track record working with publicly traded companies of all sizes and across a wide range of industries, including telecommunications, technology, industrial, financial, medical, and business services. He has built a reputation as a leading expert on communications best practices and has developed an extensive network on Wall Street. He has provided communications counsel to senior members of management across a wide range of issues, including M&A, management changes, earnings surprises, crisis communications, Reg-FD disclosure, etc. Prior to founding Crescendo Communications, Mr. Waldman served as vice president at a leading New York City based investor relations firm, as well as two other premier investor relations firms. Mr. Waldman also brings in-house IR experience having handled the investor relations for a multi-billion dollar satellite telecommunications company. He has a Bachelor of Science degree in Communications and Political Science from Northwestern University. There is no family relationship between Mr. Waldman and any other officer or director of the Company and his company is not a parent, subsidiary, or other affiliate of the Company.

## SIGNIFICANT PRE-PETITION BANKRUPTCY EVENTS

On February 6, 2008, Wells Fargo Bank notified the Debtors that the Debtors did not meet certain operating metrics in its credit facility for the fiscal year ended December 31, 2007. This event constituted a default under the credit facility, which resulted in Wells Fargo Bank charging the Debtors a fee of $20,000 for maintaining the existing credit facility. Additionally, it notified the Debtors that their borrowing rate was adjusted from prime to prime plus 2.5% until such time as the Debtors could come back into compliance.

On June 5, 2008, the Debtors entered into a Senior Security Purchase Agreement with Victory Park Capital ("Victory Park"). This agreement allowed for the Debtors to borrow up to $10 million to finance both working capital needs and future acquisitions. This newer facility replaced the Debtors' $7.5 million asset based working capital facility with Wells Fargo Bank. The new revolving line of credit agreement provided for borrowings limited to the lesser of $10,000,000 or the borrowing base of 80% of eligible accounts receivable plus 50% of eligible inventory plus 60% of eligible pre-billed service receivables. The interest rate per annum charged was the greater of prime plus seven percent (7.00%) and twelve percent (12.00%). As of December 31, 2008, the Debtors had requested an over advance and as a result were paying interest at fifteen percent (15%) per annum, with all principal and

interest becoming due on December 1, 2010. As of the Petition Date, the Debtors, jointly and severally, were indebted to Victory Park in the approximate amount of no less than $6,331,816.00 plus interest, costs and attorneys' fees (the "Pre-Petition Loan"). To secure the Pre-Petition Loan, the Debtors granted Victory Park a first priority lien and security interest in and upon substantially all of the Debtors' assets, including but not limited to, all real and personal property of the Debtors and the proceeds and products thereof.

The Debtors are not aware of any current or previous officers guaranteeing any debt of the Debtors.

## SIGNIFICANT POST-PETITION EVENTS IN THE CHAPTER 11 CASES

**Employment and Compensation of Professionals**

The Debtors made application to the Bankruptcy Court on July 6, 2009 for authorization to retain Bradley S. Shraiberg and Shraiberg, Ferrara & Landau, P.A., as attorneys for the Debtors. On July 7, 2009, the Bankruptcy Court entered an Interim Order Approving the employment of Debtors' attorney. Subsequently, the Debtors filed an Application for Substitution of Debtors' Bankruptcy Counsel from Shraiberg, Ferrara & Landau, P.A. to Michael A. Kaufman, P.A. pursuant to 11 U.S.C. § 327(A), *Nunc Pro Tunc* to August 10, 2010. On September 22, 2010, the Bankruptcy Court entered an Order Approving the substitution of Michael A. Kaufman, P.A. for Shraiberg, Ferrara & Landau, P.A. as Debtors' attorney. On July 16, 2009, the Debtors filed an Application to Employ Richard Cartoon and Kinetic Advisors, LLC to provide restructuring advisory services to the Debtors. The Application was approved on August 6, 2009 *nunc pro tunc* to July 13, 2009. The payment of Ricard Cartoon and Kinetic Advisors, LLC's fees are subject to fee application and approval by the Court.

The Debtors made application to the Bankruptcy Court for the authority to retain the services of Fildew Hinks, PLLC as special SEC counsel on August 27, 2010 and refiled the application on September 15, 2010. The Debtors' application to employ Fildew Hinks, PLLC was approved on October 7, 2010 in Court and an Order was entered on October 26, 2010. On November 12, 2010, the Debtors made application to the Bankruptcy Court for the authority to retain the services of Louis V. Esposito, CPA of the firm of Morison Cogen, LLP and the firm of Morison Cogen, LLP ("Morison Cogen") as an accountant in this case for the purpose of providing accounting services. The Debtors' application to employ Louis V. Esposito, CPA and the firm of Morison Cogen was approved on December 2, 2010, *nunc pro tunc* to October 29, 2010 and an Order was entered on December 6, 2010. Morison Cogen has a prepetition claim in the amount of $57,320.00 and filed a proof of claim. Morison Cogen agreed to waive any prepetition amount owed to them. In addition, on April 15, 2009, May 26, 2009 and June 29, 2009, the Debtors issued to Morison Cogen potential preference payments totaling $20,000.00. The accounting firm will be providing Debtors with a $20,000.00 credit for the fixed services outlined above, subject to being approved by the Bankruptcy Court. The amount of $25,000.00 was transferred from the Debtors' DIP Account on September 15, 2010 to Morison Cogen for post-petition accounting services.

Finally, on December 2, 2010, the Debtors made application *nunc pro tunc* to November 18, 2010 to the Bankruptcy Court for the authority to retain the services of Juan Bauta, Esq. of the Ferraro Law Firm, P.A. as special counsel in this case for the purpose of advising them with regard to potential litigation against IBM for damages sustained by QSGI, Inc., regarding the loss of its mainframe business. A hearing on this application was heard on December 28, 2010 at 11:00 am and the application was granted. An order from the Court was entered on January 10, 2011.

There is an outstanding balance owed to Shraiberg, Ferrara & Landau, P.A. in the amount of $71,709.03. Said balance will be paid by applying the amount of $9,079.42 from the professional fee carve-out made by Victory Park Management, LLC. In addition, Victory Park still owes the amount of $955.88 towards the professional fee carve-out, which will also be applied to the outstanding balance owed to Shraiberg, Ferrara & Landau, P.A. Upon Confirmation of the Plan, interest on the remaining balance of $61,673.73 owed to Shraiberg, Ferrara & Landau, P.A. will begin to accrue at the rate of eight (8%) percent per annum. Principal and interest shall be paid in eight (8) equal installments commencing 120 days from the date the Plan is confirmed and continuing each 90 days thereafter until such principal and interest is paid in full in cash.

The form of payment of the attorneys' fees of Michael A. Kaufman, P.A. by way of equity in the Reorganized Debtor is subject to Court approval. Debtors have proposed to pay the firm of Michael A. Kaufman, P.A. by assigning 3,524,000 shares of the common stock in the Reorganized Debtor with a one-year holding period or 115% of the total outstanding legal fees owed to Michael A. Kaufman, P.A. to be paid within one year of the Confirmation Date. Michael A. Kaufman, P.A. has the sole discretion as to either payment method subject to Court approval. In the event Debtors' proposed Plan is not confirmed, Michael A. Kaufman, P.A. will be entitled to an Administrative Claim. The Debtors have selected the firm of Michael A. Kaufman, P.A., because of the firm's acceptance of the Debtors' proposed payment arrangement and the firm's experience with Chapter 11 reorganization cases. These services are up to the Confirmation of the Plan and all fees beyond the Confirmation Date will be based on Michael A. Kaufman, P.A.'s customary rates or a negotiated fee with the Reorganized Debtor. Post-confirmation services are outside the original scope and will be additional to the fee arrangement set forth above. For a more detailed description of this fee arrangement, please see p. 33-34 of this Disclosure.

## Post-Petition Financing

On August 21, 2009, the Bankruptcy Court entered the *Stipulation and Final Order (I) Authorizing Secured Post-Petition Financing on a Superpriority Basis Pursuant to 11 U.S.C. § 364, and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 363 and 364* ("Financing Order") authorizing the Debtors to borrow additional funds from Victory Park Capital post-petition, to use cash collateral and to grant post-petition liens, security interests, superpriority claims and adequate protection to Victory Park.

Pursuant to the Financing Order, Victory Park provided the Debtors additional borrowings, in accordance with Approved Budgets (as defined in the Financing Order), on a revolving basis up to an aggregate amount of $500,000, to the extent required for the Debtors' operations, and which amount could be increased to an aggregate amount of $750,000 in Victory Park's sole discretion (the "Post-Petition Loan").

The proceeds of the Post-Petition Loan were to be used for: (a) general working capital purposes in the ordinary course of business; and (b) the administration of each chapter 11 Case, all in accordance with the Approved Budgets pursuant to the Financing Order.

Under the Financing Order, Victory Park Capital was granted a security interest and liens pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code in all currently owned or hereafter acquired property and assets of each of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, all cash, goods, accounts receivable, inventory, cash in advance deposits, general intangibles, goodwill, investment property (including, without limitation, ownership interests in corporations, partnerships, and limited liability

companies), deposit accounts, real estate, intellectual property, machinery, equipment, fixtures, leasehold interests, trademarks, trade names, licenses, leases and lease interests, causes of action excluding, any actions and recoveries thereon against third parties, tax refund claims, commercial tort claims and insurance proceeds, and the proceeds, products, rents and profits of all of the foregoing (all of the foregoing, the "Collateral"), subject only to, in the event of the termination of the post-petition DIP Facility, the payment of the DIP Carve Out (as defined in the Financing Order).

**Sale of Substantially all of Debtors' Assets**

On September 9, 2009, the Bankruptcy Court entered the *Order Granting In Part and Denying In Part Debtors' Emergency Motion for Entry of an Order (A) Authorizing and Scheduling the Sale of Substantially All of the Assets of the DSC division of QSGI Free and Clear of All Liens, Claims, and Encumbrances; (B) Approving Bidding Procedures and Stalking Horse Protections; (C) Approving the Notice of Sale; (D) Scheduling an Auction to Accept Higher and Better Bids; and (E) Scheduling Hearing to Approve Sale Arising Out of Auction Pursuant to 11 U.S.C. § 363* (the "DSC Sale").

Victory Park was the successful bidder at the DSC Sale auction by way of its credit bid of $500,000, and on September 24, 2009, the Bankruptcy Court authorized the DSC Sale to Victory Park and entered the *Order Pursuant to 11 U.S.C. §§ 105, 363 and 365 of the Bankruptcy Code (A) Approving the Sale of Substantially All of the Assets of the DSC Division of QSGI, Inc. Free and Clear of all Liens, Claims and Encumbrances and Interests; (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* ("DSC Sale Order").

Pursuant to the DSC Sale Order, Victory Park agreed to carve-out from its secured collateral the following sums: (i) $50,000 for the general unsecured creditors of the Debtors (the "Unsecured Carve-Out"); (ii) $127,000 for non-Professional administrative expenses (the "Administrative Claim Carve-Out"); and (iii) $260,000 for the Bankruptcy Court approved fees and expenses of Debtors' former counsel, Shraiberg, Ferrara & Landau, P.A. and restructuring consultants, Kinetic Advisors (the "Professional Carve-Out").

Pursuant to the Order Granting Debtor-In-Possessions' Application for Substitution of Debtor's Bankrupty Counsel, entered on September 22, 2010, funds were transferred to the trust account of Michael A. Kaufman, P.A. in the amount of $2,302.60, as part of the Administrative Claim Carve-Out. Upon Confirmation, any funds remaining in the Administrative Claim Carve-Out shall be returned to Victory Park, pursuant to the DSC Sale Order, and Michael A. Kaufman, P.A. is authorized to release any such funds without further authorization of the Bankruptcy Court.

On September 15, 2009, the Bankruptcy Court entered the *Order Granting in Part and Denying in Part Debtors' Emergency Motion for Entry of an Order (A) Authorizing and Scheduling the Sale of Substantially All of the Assets of the DCM Division of Qualtech Services Group, Inc. Free and Clear of All Liens, Claims and Encumbrances; (B) Approving Bidding Procedures and Stalking Horse Protections; (C) Approving the Notice of Sale; (D) Scheduling an Auction to Accept Higher and Better Bids; and (E) Scheduling Hearing to Approve the Sale Arising Out of Auction Pursuant to 11 U.S.C. § 363* ("DCM Sale").

SMS Maintenance, LLC was the successful bidder at the DCM Sale auction by way of its asset purchase agreement of $2.45 million, plus an additional $20,000 payment to partially offset pre-closing payroll expenses, and on September 24, 2009 the Bankruptcy Court entered the *Order Pursuant to 11*

*U.S.C. §§ 105, 363 and 365 of the Bankruptcy Code (A) Approving the Sale of Substantially All of the Assets of the DCM Division of Qualtech Services Group, Inc. Free and Clear of Liens, Claims, Encumbrances and Interests; (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* ("DCM Sale Order").

Upon the closing of the DSC Sale and the DCM Sale, the Debtors ceased substantially all business operations.

## Current Management

Since the bankruptcy filing, Marc Sherman and David J. Meynarez have been running the Debtors' reorganization, and facilitating the Chapter 11 case, in the following ways: negotiating and settling with Secured creditors; removal of greater than $11 million of debt on the condition of Confirmation of the Plan, negotiation and preparation of the Disclosure Statement and Plan; preparation of Monthly Operating Reports; multiple court appearances; document procurement for SEC inquiries; document retention; filing 2008 Federal and State Tax returns; collection of outstanding balances due to estate ($30,000); working with bankruptcy counsel on the Chapter 11 cases; negotiating settlement with SFL, former bankruptcy counsel; settlement of IRS claim, ($150,000); search and retention of IBM claim contingency attorney; negotiating with QSGI accountants to recover $45,000 of post-petition payments and preferential payments; searching for and installing new outside Board of Directors; hiring new bankruptcy counsel to reemerge from bankruptcy for the benefit of the creditors; identifying preferential payments for recovery and use in reorganization; closing books to perform financial statement audits; and obtaining shareholder list for notice from transfer agent (reestablishing relationship with American Transfer Agent). Mr. Sherman and Mr. Meynarez have been deferring compensation for the value of services provided to the Debtors and will forego the then outstanding deferred amount if the Plan becomes confirmed. Currently, the amount of deferred compensation is $60,000 each.

## Anticipated Future of the Company

Under the proposed Plan, Debtor QSGI, Inc. shall be reorganized and continue in existence as a publicly traded entity pursuant to the restructuring plan set forth in Article 6 and 7 of the Plan as the Reorganized Debtor. The purpose of the Plan is to create a marketable entity which shall merge with another entity, KruseCom, LLC, on the Effective Date and provide recovery to the creditors of the Debtors. KruseCom provided an initial proposed Plan and Disclosure Statement to Debtors, which was prepared by KruseCom's counsel, McDonald Hopkins. The initial proposed Plan and Disclosure Statement has undergone numerous revisions to encompass necessary changes by the Debtors' current counsel. The Effective Date, that is, the Confirmation Date of the Plan, will be when KruseCom and QSGI merge. Within 180 days of the Confirmation Date, the merged Reorganized Debtor/KruseCom entity will file all QSGI 10 level SEC filings to date and comply with other regulatory issues, if any.

KruseCom is a Florida limited liability company founded by present and former employees of the Debtors, in September 2009. KruseCom has eight (8) employees of which (7) of them are former QSGI employees, and is generating revenues of $4 million per year and is a profitable, financially viable and operationally strong company. For the past twelve (12) months, KruseCom has been providing financial support and business services for the benefit of the Debtors and its Estates. The merger with KruseCom is subject to the tax free stock exchange which the outside Board of Directors of QSGI, Inc., and KruseCom Members have approved.

The proposal to merge KruseCom with QSGI, Inc. was contemplated by KruseCom and given to QSGI in the form of a Plan of Reorganization. McDonald Hopkins represents KruseCom in this proposed merger. The parties involved in discussing the proposal were Marc Sherman and David Meynarez for KruseCom and the Independent Board of Directors for QSGI. The Independent Board of Directors of QSGI is Benee Scola, William Barbera, and David Waldman. As Marc Sherman and David Meynarez are both Board Members and Employees of QSGI and KruseCom and represented KruseCom in the offer, they withheld voting on the Plan for QSGI. The Plan was unanimously approved by the Independent Board of Directors of QSGI. KruseCom's counsel does not represent QSGI in this matter.

The Board of Directors of KruseCom are Marc Sherman, Managing Member, Laura Sherman, Member and David Meynarez, Managing Member. On a combined basis, Marc and Laura Sherman owns 42.14% of KruseCom. Marc Sherman is the Chairman of the Board and CEO of QSGI. David Meynarez is CFO and Board Member of QSGI, and also directly or indirectly owns 25.93% of KruseCom. Carl Saracino owns 25.93% of KruseCom. Robert Wright, an accredited investor, assuming conversion of his Note, set forth below owns directly or indirectly 6.00% of KruseCom.

KruseCom started operation in late September 2009 and was capitalized with $115,000 in contributed assets and capital by Marc Sherman and Carl Saracino. In late 2010, KruseCom raised $250,000 via a convertible note primarily from an accredited investor to be used as working capital for a 6% stake in KruseCom on conversion. The accredited investor is Robert Wright. The Note bears interest at prime plus 3%. Further, KruseCom may use some of this capital to provide DIP financing to QSGI to facilitate the reorganization. If KruseCom is successful in merging with QSGI, the notes payable will convert into equity of the successor company as a proportion of KruseCom's interest in the successor.

KruseCom is a technology services company. KruseCom purchases and sells computer equipment and related products worldwide and provides complete equipment asset management services including data security services and environmental compliance.

KruseCom purchases excess, used and off-lease, "as-is" and refurbished mainframes and associated peripherals, midrange computers and pc computer equipment and related products from a variety of sources including Fortune 1000 companies, and leasing and finance companies. KruseCom's products are remarketed to brokers, exporters, wholesalers, retailers, value added resellers, schools, corporate end-users, or KruseCom disassembles them and remarkets them as component parts.

KruseCom sells a wide range of used, "as-is" and refurbished products, including mainframe and associated peripherals, midrange computers, notebook and desktop computers, monitors, processors, disk drives, CD's, DVD's, modems, printers and memory. The majority of the pc computers KruseCom offers for sale are brand name Intel Pentium class or equivalent products manufactured by IBM, Dell Compaq, Apple, Sony, Fujitsu, Hewlett-Packard, Gateway, Toshiba and other major manufacturers. KruseCom provides complete equipment asset management services, including data security services and environmental compliance. KruseCom considers these items to be their "principal product". KruseCom's business is marginally seasonal, with the July - September period usually being slower than other periods. This operation mirrors the Data Security and Compliance segment formerly offered by QSGI. KruseCom's corporate office is in Florida and has a warehouse in New Jersey and sales offices in Kentucky and New Hampshire. KruseCom's employees are primarily composed of former employees of QSGI.

KruseCom operates a very similar business model as QSGI prior to its acquisitions of QSGI-CCSI and Qualtech. Although some of the products have changed, the overall business strategy is the same. Thus, the risk factors before the merger and after the merger are very similar.

The Industry In Which KruseCom Competes Is Highly Competitive

KruseCom faces competition in each area of their business. Some of their competitors have greater resources and a more established market position than KruseCom has. Their primary competitors include:

Major manufacturers of computer equipment such as, Dell Computer Corporation, Hewlett Packard and IBM, each of which offer "as-is", refurbished and new equipment through their websites and direct e-mail broadcast campaigns; privately and publicly owned businesses such as Redemtech, Tech Turn and Lifespan that offer asset management and end-of-life product refurbishment and remarketing services; traditional store-based computer retailers, such as Best Buy Co., Inc., and online competitors and auction sites, such as e-Bay.

Some competitors have longer operating histories, larger customer or user bases, greater brand name recognition and significantly greater financial, marketing and other resources than KruseCom does. Some of these competitors already have an established brand name and can devote substantially more resources to increasing brand name recognition and product acquisition than KruseCom can. In addition, larger, well-established and well-financed entities may join with online competitors or computer manufacturers or suppliers as the use of the Internet and other online services increases. KruseCom's competitors may be able to secure products from vendors on more favorable terms, fulfill customer orders more efficiently or adopt more aggressive price or inventory availability policies than KruseCom can. Traditional store-based retailers also enable customers to see and test products in a manner that is not possible in the wholesale business. KruseCom's product offerings must compete with other new computer equipment and related products offered by their competitors. That competition may intensify if prices for new computers continue to decrease.

Industry cycles may strain our management and resources

Cycles of growth and contraction in the industry may strain KruseCom's management and resources. To manage these industry cycles effectively, KruseCom must: improve operational and financial systems; train and manage our employee base; successfully integrate operations and employees of businesses we acquire or have acquired; attract, develop, motivate and retain qualified personnel with relevant experience; and adjust spending levels according to prevailing market conditions. If KruseCom cannot manage industry cycles effectively, their business could be seriously harmed.

KruseCom Has Limited Principal Markets And Customers; It Has Significant Dependence On Major Customers; There Is A Risk Of Industry Concentration

KruseCom operates the majority of their business in the United States. KruseCom sells and delivers computer systems, peripheral devices and parts to more than 300 customers throughout the United States and worldwide. KruseCom cannot be certain that customers that have accounted for significant revenue in past periods will continue to generate revenue. As a result of this concentration of their customers, their results of operations could be negatively affected if any of the following occurs: one or more of their customers becomes insolvent or goes out of business; one or more of their key customers significantly reduces, delays or cancels orders; or one or more of their significant customers selects products or services from one of our competitors.

<u>KruseCom Is Subject To Risks That Their Inventory May Decline In Value Before They Sell It Or That They May Not Be Able To Sell The Inventory At The Prices They Anticipate</u>

KruseCom purchases and warehouses inventory, most of which is "as-is" or excess inventory of computer equipment. As a result, they assume inventory risks and price erosion risks for these products. These risks are especially significant because computer equipment generally is characterized by rapid technological change and obsolescence. These changes affect the market for refurbished or excess inventory equipment. KruseCom's success will depend on their ability to purchase inventory at attractive prices relative to its resale value and their ability to turn their inventory rapidly through sales. If KruseCom pays too much or holds inventory too long, they may be forced to sell their inventory at a discount or at a loss or write down its value, and their business could be materially adversely affected.

<u>Declining Prices For New Computer Equipment Could Reduce Demand For KruseCom's Products</u>

The cost of new computer equipment has declined dramatically in recent years. As the price of new computer products declines, consumers may be less likely to purchase refurbished computer equipment unless there is a substantial discount to the price of the new equipment. Accordingly, if KruseCom were to sell "as-is" or refurbished equipment directly to end users, they would have to offer the products at a substantial discount to the price of new products. As prices of new products continue to decrease, their revenue, profit margins and earnings could be adversely affected. There can be no assurance that they will be able to maintain a sufficient pricing differential between new products and their "as-is" or refurbished products to avoid adversely affecting our revenues, profit margins and earnings.

<u>If KruseCom Experiences Problems In Their Distribution Operations, They Could Lose Customers</u>

In addition to product vendors, KruseCom depends on several other third parties over whom they have limited control, including, in particular, Federal Express, United Parcel Service and common carriers for delivery of products to and from their distribution facility and to their customers. They have no long-term relationships with any of those parties. They are therefore subject to risks, including risks of employee strikes and inclement weather, which could result in failures by such carriers to deliver products to their customers in a timely manner, which could damage their reputation and name.

<u>Regulatory Compliance</u>

KruseCom's data security and destruction services help companies achieve regulatory compliance with federal legislation including:

- Gramm-Leach-Bliley Act - Requires companies which engage in financial activities such as insurance companies, banks, brokerage firms, etc. to ensure the security and confidentiality of customer information and protect against anticipated threats or hazards to information.

- Health Insurers Portability & Accounting Act of 1996 (HIPAA) – Requires healthcare companies to ensure the confidentially of all protected health information and protect against anticipated threats or hazards to information.

- Sarbanes-Oxley Act - Requires all publicly traded companies to protect investors by improving the accuracy and reliability of corporate disclosures. Requires companies to track the complete life cycle of all IT assets for seven years.

- FTC FACT Act – Requires companies to protect consumers against unauthorized access to credit report information "in connection with the disposal" of computer and other records by erasure of hard drives.

- Environmental Compliance – requires that the recycling of computers and related products be managed in a manner that is protective of human health and the environment.

From formation in late September 2009 to date, KruseCom has generated approximately $3.5M in revenue with gross margins in excess of 30% and is net income profitable. It currently has $630,000 of assets, primarily working capital related and $121,000 of liabilities assuming the conversion of all outstanding notes. Pro forma post-merger projections are included as part of the Disclosure Statement Exhibit "C". These projections assume the continued growth of KruseCom's core business at historical margin rates and the Reorganized Debtor having the ability to issue working capital stock for organic growth and strategic acquisition opportunities as set forth on the capital structure chart and debt reduction while assuming administrative claims that become due upon reorganization.

As part of the merger, KruseCom will be delivering all of its assets and liabilities with a target of $500,000 net assets, all of its vibrant, growing and profitable business operation which includes eight (8) employees with experience dating back to the late 1980's in remarketing information technology assets, backlog, customer lists that include over 20,000 unique contacts for procurement of used information technology assets, vendor lists that include multiple top 100 leasing companies, marketing, a top rated Ebay internet sales channel, contracts and intellectual property.

KruseCom although profitable, has limited operating history. This lack of operating history and the nature of KruseCom's business makes traditional cash flow valuation techniques inherent to fairness opinions difficult to assess. The market will determine the final value of the shares based on earnings. Thus no formal valuation is provided.

There is no current plan to change officers, directors, or the Independent Board of Directors after the merger with KruseCom. The Board of Directors compensation is disclosed. The two officers are Marc Sherman, with a target annual base pay of $250,000 based on monthly net income profitability, and David Meynarez, with a target annual base pay of $125,000 based on monthly net income profitability. This compensation structure is expected to be adopted post-merger. The Independent Board of Directors receiving options is set forth above in the Principals and Management section.

KruseCom is currently in good corporate standing with the State of Florida. QSGI is not in good corporate standing with those states in which it operates, but will become so as part of it regulatory compliance updating.

Pursuant to the Plan, holders of Allowed General Unsecured Claims shall receive a pro-rata distribution of 10,000,000 shares of Additional Common Stock in the Reorganized Debtor and a pro-rata distribution of the $50,000 Unsecured Carve-Out upon the Effective Date. Any portion of the $50,000 Unsecured Carve-Out and 10,000,000 Shares of Additional Common Stock in the Reorganized Debtor that is not claimed within 180 days of the distribution will be cancelled and will be utilized as operating capital in the Reorganized Debtor and revert to the corporate treasury. KruseCom in exchange for providing the capital and necessary assets to implement the restructuring transactions and the Plan, shall receive 190,000,000 of the shares of stock in the Reorganized Debtor. Up to 2,250,000 of the shares of common stock in the Reorganized Debtor shall be reserved for issuance to key third parties, which the Reorganized Debtor believes could be valuable to future success of the Reorganized

Debtor.  These key third parties could represent certain former suppliers whom QSGI consummated business transactions and had credit lines with over a period of time.  These key third parties have not been specific identified.  As KruseCom operated in a similar business as QSGI, it is believed that leveraging off these past business transactions as a reorganized company significantly free of past debts will accelerate the KruseCom's business prospects, revenue and profits. The Reorganized Debtor plans to use this stock allocation to these key third parties for entering beneficial long-term business transactions with the company.  These key third parties will thus have aligned business interests with the Reorganized Debtor as more business transactions will lead to greater value of their ownership interest in the Reorganized Debtor. The balance of the common stock shares of the Reorganized Debtor are to be retained by current Equity Interest holders.

Thus, the Debtor believes the primary purpose of the proposed Plan, which includes as a component a reverse merger with KruseCom, is to provide the highest and best value available to the secured and unsecured creditors of the Debtors, along with providing some economic value to the equity holders of Debtors.  The purpose of the Plan is not to avoid the registration requirements of Section 5 of the Securities Act of 1933.  It is the position of the Debtors that a reverse merger with KruseCom is more likely to provide economic value to creditors and security holders because creditors would convert their debt into equity ownership of an operating company and would have the opportunity to have ownership participation in an operating company.  Further, it is likely that without the merger with KruseCom such Debtors' creditors and equity holders would not receive any value for their interests, except that the holders of Allowed General Unsecured Claims would receive a pro-rata distribution of the $50,000 Unsecured Carve-Out.

It is the Debtors' belief that the familiarity of KruseCom management with suppliers and creditors of Debtors is a significant factor in the interest of KruseCom to merge with the Reorganized Debtor and has been a primary factor in the determination of the merger consideration exchange ratio. Finally, it should be noted that KruseCom is the only party to have expressed an interest in a merger with the Debtors during the entire reorganization period.

Issuance of Additional Common Stock.  Upon the Effective Date, the Reorganized Debtor shall be authorized to issue 2,000,000,000 shares of Additional Common Stock, which will be issued pursuant to an appropriate exemption from registration or pursuant to an effective registration statement.  Notwithstanding the total number of shares authorized to be issued, on or as soon as is practicable after the Effective Date, the Reorganized Debtor shall issue up to (i) 10,000,000 shares of Additional Common Stock to the holders of Allowed General Unsecured Claims; (ii) 190,000,000 shares of Additional Common Stock to KruseCom, LLC, (iii) 2,250,000 shares of Additional Common Stock for issuance to key third parties vital to the ongoing success of the Reorganized Debtor ("Key Third Parties"), (iv) 425,000 shares of Additional Common Stock to present holders of preferred shares in the Debtors, (v) 3,524,000 shares of Additional Common Stock to Michael A. Kaufman, P.A. and (vi) 10,000,000 shares for working capital in the Reorganized Debtor and to settle the contingent claims of VPC and Shraiberg, Ferrara & Landau, P.A., thus allowing the Reorganized Debtor to rid itself of all of its legacy debt. Accordingly, the following approximate capital structure of the Reorganized Debtor shall be effectuated:

QSGI, Inc.
Equity Ownership
Before Reorganization Plan

|  | Shares Outstanding | Ownership |
|---|---|---|
| Authorized | 95,000,000 |  |
| KruseCom | - | 0.00% |
| Legacy Common Stockholders | 30,922,716 | 100.00% |
| Unsecured Creditors | - | 0.00% |
| Convertible Preferred | - | 0.00% |
| Michael A. Kaufman, P.A. | - | 0.00% |
| Key third party | - | 0.00% |
| Working Capital Stock Issuance | - | 0.00% |
| Total Outstanding | 30,922,716 |  |

QSGI, Inc.
Equity Ownership
After Reorganization Plan

|  | Shares Outstanding | Ownership |
|---|---|---|
| Authorized | 2,000,000,000 |  |
| KruseCom | 190,000,000 | 80.90% |
| Legacy Common Stockholders | 30,922,716 | 13.17% |
| Unsecured Creditors | 10,000,000 | 4.26% |
| Convertible Preferred | 425,000 | 0.18% |
| Michael A. Kaufman, P.A. [4] | 3,524,000 | 1.50% |
| Key third party |  | 0.00% |
| Working Capital Stock Issuance |  | 0.00% |
| Total Outstanding | 234,871,716 |  |

QSGI, Inc.
Equity Ownership
After Reorganization Plan
Partially Diluted

|  | After Transaction | Ownership |
|---|---|---|
| Authorized | 2,000,000,000 |  |
| KruseCom | 190,000,000 | 76.89% |
| Legacy Common Stockholders | 30,922,716 | 12.51% |
| Unsecured Creditors | 10,000,000 | 4.05% |
| Convertible Preferred | 425,000 | 0.17% |
| Michael A. Kaufman, P.A. [5] | 3,524,000 | 1.43% |
| Key third party | 2,250,000 | 0.91% |
| Working Capital Stock Issuance | 10,000,000 | 4.05% |
| Total Outstanding | 247,121,716 |  |

---

[4] Subject to a final fee application and approval by the Court.

[5] Subject to a final fee application and approval by the Court.

As part of the Plan, subsequent to the approval of the Court, QSGI as soon as practicable after the merger with KruseCom intends to sell up to 10,000,000 of the shares of its common stock.

High net worth individuals, family funds, and institutional investors are the likely investors in a QSGI/KruseCom merged company. The solicitation of these investors would likely occur in the quarter following the merger, based on market conditions. KruseCom is profitable and has sufficient capital to operate and transact business. The capital raised would be used to leverage off the QSGI vendor and customer relationships to aid in growth of the newly merged entity. This expansion will necessitate additional working capital to fully realize the full benefit of the merger.

There is currently on deposit in the Trust Account of Michael A. Kaufman, P.A., the amount of $50,000 which has been set aside for distribution to the General Unsecured Creditors by way of Court Order. Under the Plan, however, the holders of Allowed General Unsecured Claims will receive a pro-rata distribution of the $50,000 Unsecured Carve-Out, and a pro-rata distribution of 10,000,000 shares of Additional Common Stock in the Reorganized Debtor. Upon the Effective Date of the Debtors' Plan, the Unsecured Carve-Out will be released by Michael A. Kaufman, P.A. to the Reorganized Debtor to be distributed by the Reorganized Debtor to the unsecured creditors pursuant to the Plan. The distribution of the Unsecured Carve-Out shall be done as soon as practicable, but no later than 180 days after Confirmation. The firm of Michael A. Kaufman, P.A., will be duly authorized to make such transfer upon the Effective Date of the Debtors' Plan and no further application to the Court will be necessary for such authority.

The Estates of QSGI-CCSI, Inc. and Qualtech Services Group, Inc. shall be fully liquidated under the Plan on the Effective Date of the Plan. QSGI-CCSI, Inc. and Qualtech Services Group, Inc. will be fully dissolved and will no longer be active corporations.

**Pre- and Post-Petition Transfers**

Approximately $3.2 million was paid to creditors during the 90-day preference period prior to bankruptcy filing. The Debtors have reviewed $1.2 of the $3.2 million and have determined that of that portion there are valid defenses, such as new value and ordinary course. The Debtors are in the process of obtaining the records needed to complete the analysis of the remaining $2 million in pre-petition transfers, the documents to effect such analysis may not be available to the Debtors. All preference recoveries, if any, will be property of the Reorganized Debtor.

A post-petition transfer was made from the Debtors' DIP account in the amount of approximately $60,000 to N-1 Technologies, Inc. The Debtors believe this payment may be avoidable as an unauthorized post-petition transfer pursuant to Bankruptcy Code § 549. Debtors disclose that litigation may be initiated against N-1 Technologies, Inc. in order to recover the aforementioned payment on behalf of the Reorganized Debtor. All recovery in this litigation, if any, will be property of the Reorganized Debtor.

**Post-Petition Litigation; Other Events of Significance**

Victory Park Management, LLC and Victory Park Capital Advisors, LLC (collectively "VPC") made claims against QSGI regarding pre-petition overstatements of inventory valuation and post-petition interference with the sale process of the assets. VPC alleged that QSGI overstated its inventory in seeking financing from VPC. More specifically, notwithstanding that QSGI had established an

inventory reserve and VPC was aware of this fact, VPC alleged that the inventory on hand at the time it took possession of the collateral – that is, post-bankruptcy -- was substantially less both in quantity and value than the inventory carried on QSGI's books. With respect to the sale of assets, VPC asserted that Marc Sherman interfered with the post-bankruptcy sale process by refusing third parties access to the collateral for purchase and by requiring that any transaction involving QSGI also include employment of the then current QSGI management team. The amount of the damages sought by VPC is known by VPC. QSGI denied the validity of the allegations.

On April 14, 2010, QSGI settled its dispute with VPC following negotiation between the parties. The precise terms of the settlement are set forth in the Settlement Agreement and Mutual Release, which was filed in the Bankruptcy Court (DE 230). The Settlement Agreement and Mutual Release contains an express statement by QSGI of no admission of wrongdoing. Although the Debtors disputed all claims, the Debtors (in conjunction with their insurer) settled with VPC after considering the total cost of litigation. Other than an obligation to pay $150,000 if QSGI is ultimately reorganized, the settlement releases the Debtors from any and all claims VPC may have against them. The settlement with VPC was approved by the Bankruptcy Court pursuant to its Order Approving Expedited Amended Joint Motion for Approval of Settlement Agreement between Debtors and Victory Park Management, LLC pursuant to Fed.R.B.P. 9019 which was entered May 27, 2010. In addition to the terms of the settlement document, VPM will not object to, vote against, or directly or indirectly propose a competing or alternative plan of reorganization of and for any debtor in the Bankruptcy Cases. This foregoing language of the settlement document deems that the Class of Victory Park Management, LLC has accepted the Plan. The amount of 4,125,000 shares of restricted stock will be deemed returned by VPC to the corporate treasury of the Debtor upon confirmation of the Plan and VPC will not receive any additional distribution under the Debtors' Plan. No further action will be required by the Reorganized Debtor.

In addition, a settlement agreement and mutual release was entered into by and between John Riconda, on one hand, and QSGI INC., on the other to settle asserted claims by both parties against each other in June 2010. On July 2, 2010, a joint motion for approval of settlement agreement between debtors and John Riconda pursuant to Fed.R.Bankr.P. 9019 and Local Rule 9013-1(D) was filed with the United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division to approve the terms of the settlement agreement between Debtors and John Riconda. The motion was approved by the Bankruptcy Court on August 9, 2010. In addition to the terms of the settlement document, Riconda shall support and not object to any plan or proposed plan of reorganization for QSGI filed in the Bankruptcy Proceeding, even if in said plan he receives disparate or different treatment than other similarly situated creditors of QSGI. Riconda will not receive a cash payment on his claim or equity in the re-organized entity. This foregoing language of the settlement document deems that the Class of John Riconda has accepted the Plan. The amount of 13,500,000 shares of restricted stock will be deemed returned by Riconda to the corporate treasury of the Debtors upon confirmation of the Plan and Riconda will not receive any additional distribution under the Debtors' Plan. No further action will be required by the Reorganized Debtor.

**Substantive Consolidation of the Debtors**

In order to deal with the claims of the Debtors' creditors in the most expeditious and equitable manner, the Debtors request that the Court order the substantive consolidation of the Debtors. The Debtors request that the Court order substantive consolidation of their cases pursuant to its general

equitable powers. *See Eastgroup Properties v. Southern Motel A'ssn*, 935 F.2d 245 (11th Cir. 1991). As stated by the 11th Circuit in the *Eastgroup Properties* case:

> The purpose of substantive consolidation is "to insure the equitable treatment of all creditors." *In re Murray Indus.*, 119 B.R. 820, 830 (Bankr. M.D. Fla.1990). It involves the pooling of the assets and liabilities of two or more related entities; the liabilities of the entities involved are then satisfied from the common pool of assets created by consolidation. See *In re Augie/Restivo Baking Co.*, 860 F.2d at 518; *Holywell Corp. v. Bank of New York*, 59 B.R. 340, 347 (S.D. Fla.1986). In a Chapter 11 consolidation case, the creditors of the consolidated entities are combined for the purpose of voting on reorganization plans. *In re Augie/Restivo Baking Co.*, 860 F.2d at 518. In addition, substantive consolidation eliminates the inter-corporate liabilities of the consolidated entities. *Id.*; *see also Holywell Corp.*, 59 B.R. at 347.
>
> Because the entities to be consolidated are likely to have different debt-to-asset ratios, consolidation "almost invariably redistributes wealth among the creditors of the various entities." *In re Auto-train*, 810 F.2d at 276. Thus, courts have stated that substantive consolidation should be "used sparingly." *See In re Continental Vending Machine Corp.*, 517 F.2d at 1001 (quoting *Chemical Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966)). There is, however, a "modern" or "liberal" trend toward allowing substantive consolidation, which has its genesis in the increased judicial recognition of the widespread use of interrelated corporate structures by subsidiary corporations operating under a parent entity's corporate umbrella for tax and business purposes. *In re Murray Indus.*, 119 B.R. at 828-29.

*Eastgroup Properties v. Southern Motel A'ssn*, 935 F.2d at 248-49 (footnotes omitted). The 11th Circuit further holds:

> [T]he proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit. When this showing is made, a presumption arises "that creditors have not relied solely on the credit of one of the entities involved." *Matter of Lewellyn*, 26 B.R. at 251-52. Once the proponent has made this prima facie case for consolidation, the burden shifts to an objecting creditor to show that (1) it has relied on the separate credit of one of the entities to be consolidated; and (2) it will be prejudiced by substantive consolidation. *See In re Auto-train*, 810 F.2d at 276 ("a creditor may object on the grounds that it relied on the separate credit of one of the entities and that it will be prejudiced by the consolidation"); *see also Matter of Lewellyn*, 26 B.R. at 252 ("once the proponent of consolidation makes out a prima facie case the burden shifts to the objector to show there was sole reliance on the credit of one entity"); *In re Snider Bros.*, 18 B.R. at 238 (that objecting creditor "has looked solely to the credit of its debtor" and "is certain to suffer more than minimal harm as a result of consolidation" constitutes defense to

substantive consolidation).  Finally, if an objecting creditor has made this showing, "the court may order consolidation only if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm."

*Id.* at 249 (some citations and footnotes omitted).

In the Debtors' case, QSGI, Inc. owns one hundred percent of the stock of QSGI-CCSI and Qualtech.  The Debtors share most business functions, including a shared back office, human resources department, legal, accounting and marketing functions.  All of the Debtors have a common board of directors and some common officers.  *See In re Vecco Construction Indus., Inc.*, 4 B.R. 407, 410 (Bankr. E.D. Va. 1980); *Pension Benefit Guar. Corp. v. Ouimet Corp.*, 711 F.2d 1085, 1093 (1st Cir. 1983).  Most significantly, the Debtors sole remaining asset in addition to QSGI, Inc.'s corporate listing is the common pool of $50,000 that has been set aside for the claims of all the Debtors' creditors.  While there are more claimed filed against QSGI, Inc. than against the other two Debtors, which would result in a dilution of the return from the $50,000 carveout to QSGI, Inc.'s creditors, the Debtors believe that the administrative convenience in treating the claims on a consolidated basis, with the attendant reduction in time and administrative cost, far outweighs the burden to QSGI, Inc.'s creditors.

### Preservation of Causes of Action

Except as otherwise provided in the Plan or the Confirmation Order or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code §1123(b), the Reorganized Debtor will retain for its own benefit and may pursue, not pursue, settle, release, or enforce, in its sole and absolute discretion, all claims, rights or Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estate may hold against any Person, including Causes of Action arising under Chapter 5 of the Bankruptcy Code.  The Debtors are not currently in a position to express an opinion on the merits of any Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action.  No claim, right or Causes of Action, suit or proceeding shall, under any circumstances, be waived as a result of the failure of the Debtors to describe same with specificity in the Plan or the Disclosure Statement.  Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any *res judicata*, collateral estoppel or other preclusive effect which would precede, preclude, or inhibit prosecution of such claims, rights or Causes of Action, suits and proceedings following Confirmation of the Plan.  The recoveries of any Causes of Action shall be deposited in the Reorganized Debtor's bank accounts and used to pay operating expenses.  The Debtors hereby disclose that there is a potential cause of action against IBM, Inc., and its affiliated companies based regarding IBM's refusal to allow Debtors to modify certain mainframe computers to comply with customer needs.  The Debtors retain their right to pursue this cause of action and any moneys recovered as a result of the litigation will be deposited into the Reorganized Debtor's bank accounts and used for operating costs of the Reorganized Debtor.  It is further disclosed that the initiation of such litigation against IBM, Inc. will consist of an extraordinary amount of time expended by a law firm requiring that the agreement for services be on a contingent basis.  On December 2, 2010, the Debtors made application to the Bankruptcy Court for the authority to retain the services of Juan Bauta, Esq. of the Ferraro Law Firm, P.A. as special counsel in this case for the purpose of advising them with regard to the potential litigation against IBM.  A hearing on this application was heard on December 28, 2010 at 11:00 am and the application was granted.  An order from the Court was entered on January 10, 2011.  The Debtors have been advised by special counsel that the statute of limitations for this cause of action may expire the first week of January 2011.  The special counsel for the Debtor

has entered into an approximate four-month tolling agreement regarding the statute of limitations. Any recovery from the said litigation, if any, will be property of the Reorganized Debtor.

**Claims Analysis**

Currently, the claims filed with the court register are totaled by the court as follows:

|  | QSGI, Inc. | QSGI-CCSI, Inc. | Qualtech Services Group, Inc. |
|---|---|---|---|
| Unsecured | $8,994,426.43 | $1,629,259.63 | $419928.08 |
| Secured | $910,107.56 | $10,004,815.24 | $17,927.85 |
| Priority | $208,965.64 | $33,970.06 | $76,791.24 |
| Unknown | $3469.12 | | |
| Total | $10,116,968.75 | $11,668,044.93 | $514,647.17 |

Based on the Debtors' initial review, Debtors intend to object to certain claims and anticipates that they will be successful in the claim objections process. Also, some claims are duplicative as they were filed in each of the bankruptcy cases, when they should have been filed in only one. Most of the priority claims are by various state tax authorities, some of which have withdrawn their claims while others have filed estimations of taxes owed. Because the Debtors have generated limited revenue since the filing of the Petition, the Debtors anticipate that the total priority claims will be reduced to near zero after claims reconciliation and once the proper documents have been filed with the various state tax authorities. In the event that any priority claims remain, these will be paid pursuant to the Plan. Further, after claims reconciliation, the secured claims will be zero given that pursuant to the Riconda Settlement, Riconda shall not be entitled to any Distributions, payments or other interests under the Plan or in the Reorganized Debtor on account of his Allowed Claim. The Plan contemplates a substantive consolidation of the bankruptcy estates so that claim distributions will be through the consolidated estate.

**Liquidation Analysis**

Pursuant to the Debtors' schedules filed pursuant to Bankruptcy Rule 1007, there are total unsecured claims against the Debtors' Estates in the amount of approximately $21.1 million dollars. The Debtors and/or the Reorganized Debtor, however, reserve the right to amend, dispute and/or object to any scheduled Claim or Proof of Claim of any party under the Plan.

Taking into account the foregoing, if the Plan is not confirmed, the only available liquid assets for recovery and distribution by a chapter 7 trustee are set forth on the Liquidation Analysis spreadsheet attached hereto as Exhibit C.

However, after payment of: (i) the costs of Chapter 7 administrative fees, expenses, and the costs of liquidating the available assets; (ii) allowed outstanding chapter 11 administrative expenses; and (iii) allowed priority unsecured claims, the Debtors believe the only funds likely to be available to make a distribution to allowed general unsecured claims would be the $50,000 Unsecured Carve-Out, which translates to a distribution to allowed general unsecured claims of less than one percent (1%).

Under the Plan, however, the total unsecured claims against the Debtors' Estates will be reduced by $10,159,000, the amount of the Allowed Unsecured Claim of John Riconda, because pursuant to the Riconda Settlement Riconda shall not be entitled to any Distributions, payments or other

interests under the Plan or in the Reorganized Debtor on account of his Allowed Claim. Further, under the Plan, the total unsecured claims will be reduced by approximately $5 million dollars of the callable preferred stock. Thus, one of the benefits of the Plan shall be that the total unsecured claims against the Debtors' Estates shall be reduced from the amount of approximately $21.1 million dollars to approximately $6 million.

Further, under the Plan, Allowed General Unsecured Claims will receive a pro-rata distribution of the $50,000 Unsecured Carve-Out and a pro-rata distribution of 10,000,000 shares of Additional Common Stock in the Reorganized Debtor. QSGI's shares are presently trading on OTCBB as QSGIQ and has had a 52 week range of $0.0001 to $0.30 per share. The Debtors expect that the value of the stock upon the consummation of the merger with KruseCom an operating company, along with the full implementation of the Restructuring Transaction set forth in the Plan, will provide investors with the opportunity to enjoy an increase in the value of their investment. Parties should be aware, however, that the value of securities may fluctuate based upon a variety of factors, and therefore there is a risk that the securities may substantially diminish in value or have no value over time.

Notwithstanding, the Debtors believe that acceptance of the Plan is in the best interests of the Estates and their creditors, as it will allow for the greatest possible recovery.

## SUMMARY OF THE PLAN

### General Overview of the Plan Treatment of Claims and Equity Interests

Except as otherwise provided below, each Holder of an Allowed Administrative Expense Claim shall be paid (a) on the Effective Date, an amount, in Cash equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtor, or (c) as otherwise ordered by order of the Bankruptcy Court

The Debtors shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. Section 1930(a)(6) within ten (10) days of the entry of this order for pre-confirmation periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the cash disbursements for the relevant period. The Reorganized Debtor shall further pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) based upon all disbursements of the Reorganized Debtor for post-Confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), until the earlier of the closing of this case by the issuance of a Final Decree by the Court, or upon the entry of an Order by this Court dismissing this case or converting this case to another chapter under the United States Bankruptcy Code, and the party responsible for paying the post-Confirmation United States Trustee fees shall provide to the United States Trustee upon the payment of each post-Confirmation payment an appropriate affidavit indicating all the cash disbursements for the relevant period.

All Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Bankruptcy Case shall be paid by the Reorganized Debtor in the ordinary course of business in accordance with contract terms or as may be otherwise agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtors or the Reorganized Debtor.

### Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall receive, on account of such Allowed Priority Tax Claim, at the option of the Debtors, payment in full or regular installment payments in Cash in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code.  Notwithstanding the above, each Holder of an Allowed Priority Tax Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtor, as the case may be.

## Unclassified Claims

As provided in Bankruptcy Code §1123(a)(1), Administrative Claims and Priority Tax Claims are not classified for purposes of voting on, or receiving distributions under, this Plan. Holders of Administrative Claims and Priority Tax Claims are not entitled to vote on this Plan but, rather, are treated separately in accordance with Article 3 of the Plan and under Bankruptcy Code §1129(a)(9)(A).

**Administrative Claim of Michael A. Kaufman, P.A.**   The Administrative Claim of Michael A. Kaufman, P.A. shall be paid by way of Michael A. Kaufman, P.A. receiving 3,524,000[6] shares of common stock in the Reorganized Debtor or 115% of the actual fees incurred up to the Confirmation Date.  All costs incurred up to Confirmation are to be paid by the Debtor, subject to Bankruptcy Court approval, and are separate and distinct from the fee arrangement of equity or 115% of actual fees.  At anytime up to 365 days following the Confirmation Date, and at Michael A. Kaufman, P.A.'s sole discretion, Michael A. Kaufman, P.A. can elect to receive 3,524,000 shares of common stock in the Reorganized Debtor or 115% of the actual fees incurred up to the Confirmation Date.  If Michael A. Kaufman, P.A. elects to receive stock in the Reorganized Debtor, then the Reorganized Debtor shall make immediate delivery of the 3,524,000 shares of common stock to the brokerage account of Michael A. Kaufman, P.A. at the end of 365 days following the Confirmation Date.  However, by mutual agreement between the two parties, the Reorganized Debtor may make early delivery of the stock prior to the end of 365 days following the Confirmation Date.  If early delivery of the stock is made, Michael A. Kaufman, P.A. cannot sell the stock for a holding period ending one year from the Confirmation Date.  However, by mutual agreement between the two parties, this one-year holding period may be amended or removed.  Further, if Michael A. Kaufman, P.A. elects to receive stock, whether early delivery is made or delivery is made at the end of 365 days following the Confirmation Date, by mutual agreement between the two parties delivery need not be made in one lump issuance but, rather, partial issuance of the stock may be made at intervals.  If no election is made by Michael A. Kaufman, P.A., then the Reorganized Debtor shall make a cash payment seven (7) days after the end of 365 days following the Confirmation Date to Michael A. Kaufman, P.A. for the 115% of the actual fees incurred up to the Confirmation Date.  The form of payment of the attorneys' fees of Michael A. Kaufman, P.A. by way of equity in the Reorganized Debtor is subject to Bankruptcy Court approval.

The Debtor acknowledges that it has been advised in writing of the desirability of seeking and has been given reasonable opportunity to seek the advice of independent legal counsel regarding this fee arrangement, has fully considered the advantages and disadvantages to it of this arrangement, and is not relying on the advice of Michael A. Kaufman, P.A. or any of its members regarding those advantages or disadvantages.  The Debtor fully understands the terms of this arrangement, has considered alternatives to this arrangement, is satisfied that the terms of this arrangement are fair and reasonable to it, wishes to enter into this arrangement, and has given its consent to this arrangement.
The Debtor and the Reorganized Debtor further understand that it has been advised to seek independent financial and legal advice prior to making any future decision as it relates to this arrangement.

---

[6] See Charts showing Equity Ownership After Reorganization Plan on p. 27 of this Disclosure Statement.

Further, all fees incurred up to Confirmation must be approved by the Bankruptcy Court. All fees beyond the Confirmation Date will be based on Michael A. Kaufman, P.A.'s customary rates or a negotiated fee with the Reorganized Debtor. These services are outside the original scope and will be additional to the fee arrangement set forth above.

**Administrative Claim of Shraiberg, Ferrara & Landau, P.A.** Upon Confirmation of the Plan, interest on the remaining balance of $61,673.73 owed to Shraiberg, Ferrara & Landau, P.A. will begin to accrue at the rate of eight (8%) percent per annum. Principal and interest shall be paid in eight (8) equal installments commencing 120 days from the date the Plan is confirmed and continuing each 90 days thereafter until such principal and interest is paid in full in cash.

## Class 1: Allowed Priority Claims

Class 1 consists of all Priority Claims. Each Holder of an Allowed Priority Claim shall be paid (a) on the Effective Date, an amount, in Cash by the Reorganized Debtor equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B) of the Bankruptcy Code, (b) as otherwise agreed to by the Debtor and the Holder of an Allowed Priority Claim, or (c) as otherwise ordered by a Final Order of the Bankruptcy Code.

Class 1 is not Impaired, and the holders of Class 1 Allowed Claims are deemed to have accepted the Plan.

## Class 2: Allowed Claim of Victory Park

Class 2 consists of the Allowed Claim of Victory Park. Contingent upon entry of the Confirmation Order, Victory Park shall have an Allowed Claim in the amount of $150,000 against the Reorganized Debtor (the "Post Confirmation Claim"), which Post Confirmation Claim shall accrue interest at eight percent (8%) per annum and be paid in eight (8) equal installments commencing 120 days after the Confirmation Date, and continuing each 90 days thereafter until paid in full in cash. Upon payment in full of the Post Confirmation Claim, including interest thereon, all Liens, claims and interests of Victory Park in the Debtor's corporate shell, and any other Assets or stock of the Debtors or the Reorganized Debtor shall be waived, released and terminated. Victory Park shall not be entitled to any other Distributions or payments of any kind but for the Post Confirmation Clam. The amount of 4,125,000 shares of restricted stock will be deemed returned by VPC to the corporate treasury of the Debtor upon confirmation of the Plan and VPC will not receive any additional distribution under the Debtors' Plan. No further action will be required by the Reorganized Debtor.

Class 2 is not Impaired, and the holders of Class 2 Allowed Claims are deemed to have accepted the Plan.

## Class 3: Allowed Claim of John Riconda

Class 3 consists of the Allowed Claim(s) of John Riconda ("Riconda") pursuant to the Riconda Settlement. As set forth in the Riconda Settlement, Riconda holds an Allowed Unsecured Claim against QSGI, Inc. in the amount of $10,159,000. However, pursuant to the Riconda Settlement, Riconda shall not be entitled to any Distributions, payments or other interests under the Plan or in the Reorganized Debtor on account of his Allowed Claim. The amount of 13,500,000 shares of restricted stock will be deemed returned by Riconda to the corporate treasury of the Debtor upon confirmation of the Plan and

Riconda will not receive any additional distribution under the Debtors' Plan. No further action will be required by the Reorganized Debtor.

Class 3 is not Impaired, and the holders of Class 3 Allowed Claims are deemed to have accepted the Plan.

**Class 4:  Allowed General Unsecured Claims**

Class 4 consists of all Allowed General Unsecured Claims. Unless the Debtors or the Reorganized Debtor and the holder of such Allowed General Unsecured Claim agree to a different treatment, and subject to the provisions of this Plan, each holder of an Allowed General Unsecured Claim will receive a pro-rata distribution 10,000,000 shares of Additional Common Stock in the Reorganized Debtor and a pro-rata distribution of the $50,000 Unsecured Carve-Out. Upon the Effective Date of the Debtors' Plan, the Unsecured Carve-Out will be released by Michael A. Kaufman, P.A. to the Reorganized Debtor to be will distributed by the Reorganized Debtor to the unsecured creditors pursuant to the Plan. The distribution of the Unsecured Carve-Out shall be done as soon as practicable, but no later than 180 days after Confirmation. The firm of Michael A. Kaufman, P.A., will be duly authorized to make such transfer upon the Effective Date of the Debtors' Plan and no further application to the Court will be necessary for such authority.

Class 4 is Impaired.

**Class 5: Equity Interests and Claims**

Class 5 consists of all Equity Interests and Claims of preferred shareholders.

Preferred stockholders: In December 2005, QSGI completed a private placement with Pike Capital Partners, LP and Guerilla Partners, LP. for net proceeds of approximately 4.2 million. Under the Plan, the present lawful owners of preferred stock in the Debtors shall have their shares converted to an aggregate of 425,000 shares of common stock in the Reorganized Debtor, to be distributed pro-rata among the preferred shareholders.

Class 5 is Impaired.

**Class 6: Equity Interests and Claims**

Common Stockholders and other Equity Interests: The lawful holders of common stock in the Debtors and all other Equity Interests and Claims shall retain all common stock and Equity Interests under the Plan.

Class 6 is Impaired.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Assumption and Rejection of Certain Executory Contracts and Leases.**

Pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that existed between the Debtors and another Person or Entity as of the Petition Date

shall be deemed rejected by the Debtors as of sixty (60) days after the Effective Date (collectively the "Rejected Contracts").

**Cure Claims from Assumption and Damages Arising from Rejection of any Executory Contract or Unexpired Leases.**

Any Claim for actual or possible cure arising by reason of the pending or potential assumption of any executory contract or unexpired lease not previously assumed pursuant to order of the Bankruptcy Court or where there is pending before the Bankruptcy Court on the Confirmation Date ("Cure Claim") must be filed with the Bankruptcy Court thirty (30) days following the Confirmation Date and served upon the Debtor or such Claim shall be forever barred and unenforceable against the Debtors. Any Claim for damages arising by reason of the rejection of any executor contract or unexpired lease must be filed with the Bankruptcy Court thirty (30) days following the filing of the list of Rejected Contracts and served upon the Reorganized Debtor or such Claim shall be forever barred and unenforceable against the Reorganized Debtor. Such Claims, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Class 4 Allowed Claims. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith. The Debtors reserve the right to file motions to assume or reject any unexpired lease or executory contract not specifically listed in the Plan.

## MEANS OF IMPLEMENTATION OF THE PLAN

**General Overview.**

The general structure of the reorganization effort in these Reorganization Cases involves a stand-alone plan of reorganization pursuant to which QSGI shall continue to operate post-confirmation as the Reorganized Debtor.

**Continued Corporate Existence: Tax Consequences**

QSGI will continue to exist after the Effective Date as the Reorganized Debtor. Reorganized Debtor will continue as a corporation with all of the powers of a corporation under Delaware law and pursuant to its shareholder's agreement or other organizational documents in effect prior to the Effective Date, without prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date.

**Corporate Action**

All matters provided for under the Plan involving corporate structure of the Debtors or the Reorganized Debtor or any corporate action to be taken by or required of the Debtors or the Reorganized Debtor, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the Directors of the Debtors or the Reorganized Debtor.

**Section 1145 Exemption from Securities Laws**

Any securities issued, pursuant to this Reorganization Plan, to parties in exchange for Claims or Interests shall be made in reliance on Section 1145 of the Bankruptcy Code and shall be exempt to the fullest extent possible as provided by Section 1145 of the Bankruptcy Code from federal and state laws requiring registration for the offer or sale of securities.

The Debtors and the Reorganized Debtor intend to fully comply with all applicable provisions of the federal securities laws.  Notwithstanding any provision to the contrary, nothing in the Plan or in the Bankruptcy Court's Confirmation Order will relieve the Reorganized Debtor or any other person or entity from fully complying with the federal securities laws.

**Section 1146 Exemption**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any security or the making, delivery or recording of any instrument of transfer pursuant to, in implementation of or as contemplated by the Plan or any Plan Document (including documents associated with the sale of shares), or the revesting, transfer of sale of any real or personal property of, by or in the Debtors or the Reorganized Debtor pursuant to, in implementation of or as contemplated by the Plan or any Plan Document, or any transaction arising out of, contemplated by the Plan or related to the foregoing, shall not be subject to any document recording tax, stamp, tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**Term of Certain Injunctions and Automatic Stay**

Except as otherwise ordered by the Bankruptcy Court, all injunctions or automatic stays provided for in the Reorganization Cases pursuant to Section 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Any preliminary or permanent injunction entered by the Bankruptcy Court shall continue in full force and effect following the Confirmation Date and the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

**No Liability for Tax Claims**

Unless a taxing Governmental Authority has asserted a Claim against the Debtors before the Bar Date or Administrative Expense Claims Bar Date established therefore, no Claim of such Governmental Authority shall be Allowed against the Debtors or the Reorganized Debtor or their respective members, officers or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) of the failure, if any, of the Debtors, any of its Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

**Retention of Jurisdiction**

Notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising out of or relating to the Cases, the Plan, the Confirmation Order, and the Estates pursuant to, and for the purposes of, Sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a) To resolve any matters relating to the assumption and assignment or rejection of executory contracts or unexpired leases, and to hear, determine and, if necessary, liquidate any Claims resulting therefrom;

(b) To decide and resolve any and all motions, adversary proceedings, objections to Claims, including Causes of Action, Estate Litigation, applications, contested matters and any other matters, whether pending as of the Effective Date or brought thereafter in accordance with the terms hereof;

(c) To consider and rule on the compromise and settlement of any Claim, Disputed Claim, Cause of Action or Estate Litigation on behalf of the Debtors or their Estates;

(d) To ensure that Distributions to holders of Allowed Claims are accomplished as provided herein, and resolve any disputes concerning any such Distributions;

(e) To allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim (including any Administrative Expense Claim), and to resolve any and all objections to the Disputed Claims;

(f) To hear and determine any and all applications for the allowance of compensation of Professionals for professional services rendered and expenses incurred prior to the Confirmation Date;

(g) To enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan, and all contracts, instruments, releases and other agreements or documents created in connection with the Plan;

(h) To consider any modifications to the Plan, to cure any defect or omission, or reconcile any inconsistency, in the Plan or in any order of the Court as may be necessary to carry out the purposes and intent of the Plan and to implement and effectuate the Plan;

(i) To resolve any cases, controversies, suits or disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or any person's or Entity's obligations incurred in connection with the Plan;

(j) To hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

(k) To enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, revoked, reversed or vacated;

(l) To enforce remedies upon any default under the Plan;

(m) To enforce, interpret, and determine any disputes arising in connection with any orders, stipulations, judgments, and rulings entered in connection with the Cases (whether or not the Cases have been closed);

(n) To resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, or any Estate's obligations incurred in connection herewith;

(o) To determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan;

(p) To issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any person or Entity with the consummation of the Plan, or the enforcement of any rights, remedies, or obligations created under the Plan;

(q) To determine such other matters as may be provided for in the Confirmation Order or other orders of the Bankruptcy Court or as may be authorized under the provisions of the Bankruptcy Code or any other applicable law;

(r) To hear any other matters if the Court's exercise of jurisdiction thereover is not inconsistent with the Bankruptcy Code or Title 28 of the United States Code;

(s) To hear and determine issues relating to discharge, releases, injunctions, covenants not to sue, and other waivers and protections provided under or relating to the Plan;

(t) To recover all Assets of the Debtors' Estate (excepting those Assets transferred pursuant to the Sale Order); and

(u) To enter a final decree closing the Case.

**Modification or Withdrawal of the Plan**.

The Plan provides that the Debtor, in its sole and absolute discretion, may modify or withdraw the Plan at any time prior to the entry of the Confirmation Order.

## SOLICITATION OF VOTES AND VOTING ON THE PLAN

**Establishing a Voting and Distribution Record Date**

The Debtors seek to establish special procedures for solicitation and voting as well as distributions on the Plan. These procedures are necessary because Debtors' shares are publicly traded. The Debtors seek the Court's approval of a record date by which the Debtors can determine who are the holders of an Allowed Equity Interest or Claim entitled to vote to accept or reject the Plan. This shall also be the distribution record date, which would determine who will receive distributions, if any. The Debtors propose that the voting and distribution record date be set as the date on which the Court enters an order approving the Disclosure Statement.

**Delivery of Solicitation Documents to Undeliverable or Changed Addresses**

To date, some of the notices sent in these cases have been returned by the United States Postal Service or other carrier(s) as undeliverable. The Debtors expect that certain interested parties have changed their mailing address since the Petition Date. While the Debtors have attempted to maintain mailing addresses in as current a condition as is practicable, in light of the large number of holders of Equity Interest as well as Claim holders, the problem of undeliverable mail remains.

The Debtors request that, for each address for which mail has been returned as undeliverable, they be excused from the requirement of mailing solicitation materials unless a party associated with such address provides written correspondence to the Debtors' counsel, Michael A. Kaufman, Esq., at Michael A. Kaufman, P.A., 1655 Palm Beach Lakes Boulevard, Suite 1012, West Palm Beach, FL 33401, correcting such mailing address within reasonable time for the Debtors to provide sufficient notice and solicitation materials to vote on the Plan.

With respect to a holder of a Claim that has changed its mailing address subsequent to the Petition Date without updating its mailing address, either through the claims register or ECF system or through contacting Debtors' counsel directly, such party must provide written notice of change of address to Debtors' counsel, Michael A. Kaufman, Esq., at the above address within reasonable time for the Debtors to provide sufficient notice and solicitation materials to vote on the Plan. In no event should the Debtors be required to update a mailing address without a timely written notice provided by the addressee. The Debtors assert that this procedure will avoid costly and unreasonably time consuming efforts with little benefit to their creditors and shareholders.

**Establishing Claim Amounts for Voting Purposes**

The Debtors seek to establish procedures for determining the amount of each Claim for purposes of tabulating votes. Debtors will determine the amounts for voting purposes based upon, among other things, settlements approved by the Court, the Debtors' schedules of assets and liabilities, as amended, amounts listed on the claims register or otherwise asserted on filed proofs of claim not subject to objection, and amounts established, if any, by temporarily or provisionally allowed claims. The Debtors will use these procedures for purposes of tabulating votes only. They will not necessarily use these procedures to determine the allowed amount of any claim for distribution purposes. The Debtors will provide claim amounts on each ballot as a courtesy only; such information is not binding in any way on any party, including the Debtors.

## VOTING ON AND CONFIRMATION OF THE PLAN

**Confirmation and Acceptance by All Impaired Classes**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all of the requirements of the Bankruptcy Code Section 1129 are met. Among the requirements for confirmation of a plan are that the plan be accepted by all impaired classes of claims and equity interests, and satisfaction of the matters described below.

*Feasibility.* A plan may be confirmed only if it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. The Debtors believe that they will be able to perform their obligations under the Plan without further financial reorganization.

The Plan basically provides for payment to Holders of Allowed Claims, including contingent, unliquidated and Disputed Claims to the extent they become Allowed Claims, in the order of their priority. At the present time, the Debtors believe that sufficient funds will be available to fund the

payments required under the Plan to the Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals), Allowed Priority Tax Claims, Allowed Priority Claims, Allowed Secured Claims and Allowed Unsecured Claims on a *pro rata* basis to the extent set forth in the Plan. Accordingly, the Debtors believe that the Plan is feasible *per se*.

The obligations under the Plan to Holders of contingent, unliquidated and Disputed Claims cannot be ascertained without the determination of the validity and amount of those Claims by the Bankruptcy Court. Until the Claims determination process is complete, the exact amount to be received by Unsecured Creditors cannot be ascertained.

*Best Interests Standard*. The Bankruptcy Code requires that the Plan meet the "best interest" test which requires that members of a Class must receive or retain under the Plan, property having a value not less than the amount which the Class members would have received or retained if the Debtors were liquidated under Chapter 7 on the same date. The Debtors believe that distributions to all Impaired Classes of Claims in accordance with the terms of the Plan would exceed the net distribution that would otherwise take place in Chapter 7.

## Confirmation Without Acceptance by All Impaired Classes

If one or more of the Impaired Classes of Claims or Equity Interests does not accept the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Class under the "cramdown" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes under the Plan.

*Discriminate Unfairly*. The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. The Debtors believe that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no Class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank.

*Fair and Equitable Standard*. The "fair and equitable" standard, also known as the "absolute priority rule" requires that a dissenting class receive full compensation for its allowed claims or interests before any junior class receives any distribution.

With respect to the Impaired Class 4 and 5 Claims, Bankruptcy Code Section 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each Holder of a Claim of such a class receives or retains on account of such claim, property of a value as of the Effective Date of the plan equal to the allowed amount of such claim; or (ii) the Holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest. In the event that the Debtors must comply with the cramdown requirements of the Bankruptcy Code and are not able to meet the provisions of Section 1129(a), then the Plan that has been presented most likely would not be confirmed pursuant to bankruptcy law. If Class 4 or Class 5 vote against the Plan the Debtors will most likely not be able to satisfy the cramdown provisions of the Bankruptcy Code. If the Bankruptcy Court does not confirm the Plan, the merger of Reorganized Debtor and KruseCom will not be consummated and Debtors will likely not submit an alternative reorganization plan, which would result in the complete liquidation of the Debtors.

The Debtors intend to evaluate the results of the balloting and determine whether to seek Confirmation of the Plan in the event that less than all the Impaired Classes of Claims do not vote to

accept the Plan. The determination as to whether to seek Confirmation under such circumstances will be announced before or at the Confirmation Hearing.

**Absolute Priority Rule**

The Bankruptcy Code and other applicable law establish priority for distribution of funds in bankruptcy cases. These priority provisions are sometimes referred to as the "absolute priority" rule. Normally, and subject to exceptions not relevant here, valid secured claims are first paid to the extent of the amount of the claim or the value of the claimant's collateral (if less than the claim).

Any property in the bankruptcy estate, net of the valid secured claims described above, is first distributed to holders of priority claims, including (a) the costs of administering the bankruptcy case, including the cost of operating the Debtors' business during the Reorganization Cases; (b) certain wage and benefit claims; and (c) the remaining funds until paid in full.

**Non-Confirmation of the Plan**

If the Plan is not confirmed by the Bankruptcy Court, the Court may permit the filing of an amended plan, dismiss the case, or convert the case to Chapter 7. In a Chapter 7 case, the Debtors' assets would be distributed to the Unsecured Creditors after the payment of all Secured Claims, costs of administration and the payment of priority claims. Unsecured Creditors would likely receive a distribution of less than one percent of their Allowed Claim in a Chapter 7 case.

The cost of distributing the Plan and this Disclosure Statement, as well as the costs, if any, of soliciting acceptances, will be borne by the Debtors.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans under Chapter 11, (b) dismissal of the case, or (c) conversion of the case to a case under Chapter 7 of the Bankruptcy Code.

**Alternative Plans of Reorganization**

If the Plan is not confirmed, any other party in interest in the Reorganization Cases could attempt to formulate and propose a different plan or plans. Given the rather mature stage of this case, the Debtors believe that is highly unlikely. The Debtors believe that the Plan will enable Creditors to be paid the maximum amount possible for their Allowed Claims.

WHEREFORE, the Debtors, QSGI, Inc., QSGI-CCSI, Inc. and Qualtech Services Group, Inc. respectfully submit this Combined Liquidation Plan and Disclosure Statement.

Respectfully submitted,

QSGI, INC.
Debtor and Debtor In Possession

Dated: January ⅞, 2011
West Palm Beach, Florida

By: _____
Marc Sherman, CEO

QSGI, INC.
Debtor and Debtor In Possession

Dated: January 31, 2011          By: _____
West Palm Beach, Florida              David Meynarez, CFO and Board Member


QSGI-CCSI, INC.
Debtor and Debtor In Possession

Dated: January 31, 2011          By: _____
        West Palm Beach, Florida      Marc Sherman, CEO


Qualtech Services Group, INC.
Debtor and Debtor In Possession

Dated: January 31, 2011          By: _____
        West Palm Beach, Florida      Marc Sherman, CEO


QSGI, Inc.
Debtor and Debtor In Possession

Dated: January    , 2011          By: _____
        West Palm Beach, Florida      Benee Scola, Independent Board Member


QSGI, Inc.
Debtor and Debtor In Possession

Dated: January    , 2011          By: _____
        West Palm Beach, Florida      William J. Barbera, Independent Board Member


QSGI, Inc.
Debtor and Debtor In Possession

Dated: January    , 2011          By: _____
        West Palm Beach, Florida      David K. Waldman, Independent Board Member


Page 44 of 45

QSGI, INC.
Debtor and Debtor In Possession

Dated: January    , 2011                    By: _____
West Palm Beach, Florida                    David Meynarez, CFO and Board Member

QSGI-CCSI, INC.
Debtor and Debtor In Possession

Dated: January    , 2011                    By: _____
        West Palm Beach, Florida           Marc Sherman, CEO

Qualtech Services Group, INC.
Debtor and Debtor In Possession

Dated: January    , 2011                    By: _____
        West Palm Beach, Florida           Marc Sherman, CEO

QSGI, Inc.
Debtor and Debtor In Possession

Dated: January ⟨0, 2011                     By: _____
        West Palm Beach, Florida           Benee Scola, Independent Board Member

QSGI, Inc.
Debtor and Debtor In Possession

Dated: January    , 2011                    By: _____
        West Palm Beach, Florida           William J. Barbera, Independent Board Member

QSGI, Inc.
Debtor and Debtor In Possession

Dated: January    , 2011                    By: _____
        West Palm Beach, Florida           David K. Waldman, Independent Board Member

Page 44 of 45

QSGI, INC.
Debtor and Debtor In Possession

Dated: January    , 2011          By:    _____
West Palm Beach, Florida                 David Meynarez, CFO and Board Member


QSGI-CCSI, INC.
Debtor and Debtor In Possession

Dated: January    , 2011          By:    _____
     West Palm Beach, Florida            Marc Sherman, CEO


Qualtech Services Group, INC.
Debtor and Debtor In Possession

Dated: January    , 2011          By:    _____
     West Palm Beach, Florida            Marc Sherman, CEO

QSGI, Inc.
Debtor and Debtor In Possession

Dated: January    , 2011          By:    _____
     West Palm Beach, Florida            Benee Scola, Independent Board Member


QSGI, Inc.
Debtor and Debtor In Possession

Dated: January 31, 2011           By:    _____
     West Palm Beach, Florida            William J. Barbora, Independent Board Member


QSGI, Inc.
Debtor and Debtor In Possession

Dated: January    , 2011          By:    _____
     West Palm Beach, Florida            David K. Waldman, Independent Board Member


Page 44 of 45

QSGI, INC.
Debtor and Debtor In Possession

Dated: January     , 2011          By: _____
West Palm Beach, Florida               David Meynarez, CFO and Board Member


QSGI-CCSI, INC.
Debtor and Debtor In Possession

Dated: January     , 2011          By: _____
      West Palm Beach, Florida          Marc Sherman, CEO


Qualtech Services Group, INC.
Debtor and Debtor In Possession

Dated: January     , 2011          By: _____
      West Palm Beach, Florida          Marc Sherman, CEO


QSGI, Inc.
Debtor and Debtor In Possession

Dated: January     , 2011          By: _____
      West Palm Beach, Florida          Benee Scola, Independent Board Member


QSGI, Inc.
Debtor and Debtor In Possession

Dated: January     , 2011          By: _____
      West Palm Beach, Florida          William J. Barbera, Independent Board Member


QSGI, Inc.
Debtor and Debtor In Possession

Dated: January 21, 2011            By: _____
      West Palm Beach, Florida          David K. Waldman, Independent Board Member

KruseCom, LLC

Dated: January 31, 2011
    West Palm Beach, Florida

By: _____
    Marc Sherman